UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 15-35(2) (RHK/HB)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT'S POSITION WITH |
| v. | ) | RESPECT TO SENTENCING |
| | ) | |
| ALAGIE BARROW | ) | |
| | ) | |
| Defendant. | ) | |

In various formulations it has often been said, "The only thing necessary for the triumph of evil is that good men do nothing." Alagie Barrow is a good man. And after helplessly watching the long-term systematic persecution and abuse of his Gambian countrymen, he could no longer stand silently by, doing nothing. He felt compelled to take up arms in defense of his homeland. As a result of this act of tremendous courage and self-sacrifice, he now stands before the Court awaiting sentencing for violating the Neutrality Act and for use of a firearm during a crime of violence.

FACTS

The parties have submitted a joint sentencing memorandum that addresses many of the variance and departure grounds applicable to all of the defendants. Mr. Barrow here focuses on those factors that relate to him personally.

Alagie Barrow is 43 years old. He was born in Banjul, the capital city of The Gambia. His mother was a homemaker, his father a peddler. The family had limited means, and they did not have running water or electricity until Alagie was in his twenties. The family struggled to provide

the basic necessities, and food was often scarce. Alagie grew up in a family compound with numerous relatives.  Alagie shared a bed with at least one other person while he was growing up.

In 1994, the dictator Yahya Jammeh seized power through a military coup. He has been the president of The Gambia ever since. Shortly after Jammeh took control, Bassriu Barrow, a lieutenant in the Gambian military, was arrested and accused of attempting to overthrow the Jammeh regime. He was subsequently executed. Because Bassriu was a distant cousin of Alagie and his family, the entire family became targets of governmental persecution. Although Alagie Barrow had no involvement in any plot and was not close to his cousin, he was repeatedly arrested, questioned, and abused.  For two days, he was blindfolded and tortured with electric shocks. He was finally released and was hospitalized, but was repeatedly arrested after his discharge. Other relatives were also arrested and some disappeared.

Two years later in 1996, Alagie Barrow left The Gambia and entered the United States on a visitor visa. He applied for political asylum, citing the fear of persecution as a result of his cousin's arrest and execution and the torture which he had personally suffered. In 1997, he was granted asylum, giving him permanent resident alien status. He subsequently became a naturalized U.S. citizen.

Mr. Barrow attended Tennessee State University in Nashville. He graduated in 2005 with a degree in criminal justice. In 2013, he earned a master's degree in national security studies from American Military University.

While he was a student, Mr. Barrow enlisted in the Army National Guard in 2001. During 2003, he trained for six months for deployment to Iraq, but the tour was cancelled at the last minute. He had additional active service in the Army National Guard from 2005 to 2008 and 2011 to 2014. He received an Honorable Discharge in January 2014 with the rank of First

Lieutenant. During his time in the military, Mr. Barrow was a sexual assault prevention officer, drug prevention officer, and suicide prevention officer. In addition, he received numerous awards and commendations for excellence, leadership, recruiting merit ribbons, marksmanship, physical fitness, soldier of the year, war on terror, and he represented the state of Tennessee in commemorations.

Following his honorable discharge, Mr. Barrow began employment at Regal Beloit, a company that sold motors. He consistently received excellent employment reviews.

During the two decades Mr. Barrow was in the United States, he was not politically active or vocal. He followed news of The Gambia, and he contributed money to political parties that were opposed to Jammeh. When friends and relatives were killed or disappeared without a trace, he wrote to his congressmen and asked for their help. But mostly he enjoyed his middle class life in the United States. He had a family with a wife and three children, a job, and a comfortable life.

That all changed in 2013 when he was contacted by Njagga Jagne. Alagie knew Njagga's sister, Sigga, from childhood in The Gambia. She and Barrow had gone to elementary school together. Her brother, Njagga, was a Captain in the Army National Guard. Barrow and Jagne had attended officer candidate training together in Alabama. Over the years they had stayed friends through social media.

In 2013, Jagne asked Barrow if he was following current events in The Gambia. At the time, two Americans had disappeared and were never heard from again. Barrow had little hope that anything could be done to change the situation in their home country. "We need to do something," Jagne said.

A few months later, Jagne called Barrow and said he knew some people who were

putting together a plan to overthrow Jammeh. They already had someone to finance it, he said. They wanted Jagne and Barrow, because of their military backgrounds, to review the plan. In October 2013, Jagne and Barrow attended a meeting in Atlanta where they met with a number of the participants in the plan. They discussed the situation in The Gambia. Everyone was committed to helping. They said they had a financier who did not want to be known to the group. They said they would send the plan to Jagne and Barrow who would review it, refine it, and give advice from a military perspective. Jagne and Barrow were not supposed to be active participants in the coup. They were consultants.

Over the months that followed, Jagne and Barrow went back and forth modifying and refining the plan. Other participants took part as well. They used Google Docs so that everyone could participate. Their objective was to restore democracy to The Gambia. They intended to create a civilian transitional government for a short time until democratic elections could be arranged. None of the participants was interested in having a permanent role in the government. Mr. Barrow did not feel qualified, and he had no intention of living in The Gambia. His home and his family were in the United States.

As the plan continued to evolve and expand, Barrow became increasingly conflicted about his role. Jagne urged him on. "This is our nation. We can't rely on others to free our nation. It is our mothers and sisters being raped. We cannot delegate this out," Jagne told him. Barrow's conscience was pricked. He realized that he could not ask others to do what he was unwilling to do himself. This was his struggle, and he had to make the same sacrifice as the others.

In October 2014, Barrow's mother became very ill. At the same time, the group wanted someone on the ground to be sure that the shipments of supplies had arrived and

to check circumstances on the ground. Barrow agreed to go. The others joined him in December. In addition to the defendants here, there were participants from Germany, England, and Senegal. The other participants have not been prosecuted.

Njaga Jagne, Alagie Barrow's friend who had first enlisted his help, was killed in the attempted coup. The Gambian government has refused to return his body to his sister, Sigga Jagne.

Mr. Barrow had no idea that his work to return democracy to his homeland violated United States law. He knew that his efforts would make him and his family and relatives in The Gambia targets for persecution and even death, but he did not know that the United States had any interest whatsoever. To the contrary, his military experience and patriotism taught him that his efforts on behalf of his countrymen were in keeping with the highest traditions of his adopted country—fighting to win freedom for people suffering under the despotic rule of tyrants all over the globe. As a result, Mr. Barrow made no efforts to conceal his work in the United States. He purchased firearms and supplies in his own name, using his own bank accounts. When the United States began its investigation, the paper trail he left was easy to follow.

Thus, although Alagie Barrow felt compelled by the plight of his countrymen to do what he did, he never intended to violate United States law.

## DISCUSSION

The parties agreed in the plea agreement to a guideline range of 41-51 months. The probation office has come up with different calculations, based in part on an enhancement for obliterated serial numbers on some of the firearms. Mr. Barrow has no idea who scratched the serial numbers or when. As noted above, Mr. Barrow made no attempt to conceal his purchase of

firearms and had no reason to obliterate the serial numbers. Mr. Barrow asks the Court to accept the guideline calculations agreed to by the parties.

The defendant does not dwell on the guideline calculations because counting up the number of guns and other factors is an enterprise ill-suited to encompass the nature of this offense or the appropriate sentence. As a result, we turn to the § 3553(a) factors which support a probationary sentence in these unique circumstances.

**I.    The § 3553(a) Sentencing Factors Warrant a Downward Departure or Variance and a Probationary Sentence**

Given the unusual circumstances of this case, the Section 3553(a) factors support a sentence of probation. As the Supreme Court has recently reminded us, probation is not getting off easy.  "[P]robationers do not enjoy the absolute liberty to which every citizen is entitled.'" *Gall v. United States*, 128 S.Ct. 586, 595 (2007) (citation omitted).

Defendants deserving of a probationary sentence, have not escaped justice or been given a "break."

> Probation is not granted out of a spirit of leniency. . . . [P]robation is not merely 'letting an offender off easily.' The probation or parole conditions imposed on an individual can have a significant impact on both that person and society. Often these conditions comprehensively regulate significant facets of their day-to-day lives. They may become subject to frequent searches by government officials, as well as to mandatory counseling sessions with a case worker or psychotherapist.

*Gall*, 552 US. at 595 n. 4 (quoting Advisory Council of Judges of National Council on Crime and Delinquency, Guides for Sentencing 13-14 (1957) and 1 N. Cohen, The Law of Probation and Parole, § 7:9 (2d ed. 1999)).

A review of the statutory factors under § 3553(a) compels the conclusion that a term of probation is "a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing outlined in that statute.

A.      The Nature and Circumstances of the Offense, Including the Fact The Defendants
        Sought No Personal Benefit, Support a Reduced Sentence

This Court is all too familiar with the base motives that catalyze criminal conduct—

greed, jealousy, envy, revenge. Whether sentencing a fraudster, a drug dealer, or a murderer,

these are the mental states that led to the offense conduct.

This case stands apart. Whatever one may think about the defendants' conduct, they acted

with the noblest of intentions. Had they been successful, Gambian school children would have

learned songs about their heroism, and streets would have been named for them. The fact that

they failed in no way besmirches the lofty ideals that motivated them. Not only did the

defendants not seek personal gain, they acted at tremendous peril to themselves and their

families. As a military man, who served the United States honorably for over a decade, Mr.

Barrow had no illusions about the danger to which he was subjecting himself.  He was not

dissuaded because the cause was a worthy one.

In other contexts, courts have held that where the defendant was not motivated by greed,

a reduced sentence is appropriate.  For example, in *United States v. Ranum*, 353 F.Supp.2d 984

(E.D. Wisc. 2005), the defendant was convicted of misapplication of bank funds relating to a

series of unauthorized loans he made to a company.  The company ultimately failed, and the bank

lost all of the money it had loaned. *Id*. at 988.   Although the court considered the offense serious,

primarily because the loss exceeded $1 million, it found that the "defendant's culpability was

mitigated in that he did not act for personal gain or for improper gain for another."  *Id*. at 990.

The facts of the instant case present an even clearer case of reduced culpability than

*Ranum.*  As noted above, the defendants were motivated by the loftiest of ideals. They wanted

nothing more than the betterment of their oppressed brethren. They acted in accordance with the

values and ideals which Mr. Barrow saw modeled by the role of the United States military in its

pursuit of global justice. The actions of the defendants here were heroic.

These facts do not reflect a typical crime of violence and are not reflected in the guideline

range.  As a result the guidelines result in a sentence greater than necessary given the

circumstances of this case.  The defendants' motivation is an important sentencing factor not

considered by the guidelines, warranting a sentence reduction below the guideline range. A

number of courts agree in the fraud context. *See United States v. Broderson*, 67 F.3d 452, 454-59

(2d Cir. 1995) (where, "[defendant] did not personally profit from the fraud," the defendant's

"criminal intent was significantly different from that of a typical fraud defendant" and a

downward departure was appropriate); *United States v. Milne*, 384 F.Supp.2d 1309, 1311-12

(E.D. Wisc. 2005) (where the "defendant did not take the bank's money out of greed or a desire

to live a lavish lifestyle; rather, he misguidedly tried to keep a sinking business afloat," the court

reduced the defendant's sentence); United States v. Keller, No. 3:04-CR-233-G, 2005 WL

6192897 at *6 (N.D. Tex. Oct. 17, 2005) (court reduced defendant's sentence by granting a

downward departure where defendant's intent was "significantly different [from] the usual fraud

candidate").

> **B.**     **A Probationary Sentence Is Warranted in Light of Mr. Barrow's Personal History and Characteristics, Including His Long History of Military and Community Service**

Until 2014, Mr. Barrow had led not simply a blameless life, but an exemplary one.  He

stands before the Court a 43 year-old man who has never before been convicted of any crime.  He

was born and raised in The Gambia with nothing. He personally understood the persecution and

oppression inflicted on the Gambian people by Yahya Jammeh because he was a victim of that

persecution. His elderly mother and many of his relatives remain in The Gambia, and they

continue to suffer at the hands of Jammeh's brutal regime. Many of his relatives, including his mother, were arrested following the coup and interrogated.

Mr. Barrow emigrated to the United States in 1996 at the age of 23. He completed his education, earning a B.A. in 2005 and a masters in national security studies in 2013. He served for over a decade in the Army National Guard, earning the rank of first lieutenant.

Throughout his life, Mr. Barrow has always shown concern for others and has tried to help his community. He worked as a mentor in a juvenile justice center. He worked as a substitute teacher. He also volunteered as a new immigrant advocate, helping new immigrants adapt to life in the United States. During the pendency of this case, Mr. Barrow has been working at Tennessee Family Solutions, a non-profit organization that cares for developmentally disabled adults. Mr. Barrow works as a caretaker, cleaning and caring for the residents. It is little surprise that the many people who have submitted letters on behalf of Mr. Barrow speak of his tireless work on behalf of those less privileged than himself.

Mr. Barrow is a loving, supportive husband, father, and son.  He and his wife Fatoumatta Sanneh Barrow have been married for eight years. Together they have a son, Gibril Nelson Barrow who is seven. In addition, he has two other children from previous marriages. Mohammed Barrow, who lives with Alagie and Fatoumatta, is 13. Aisha Barrow, who lives with his mother and for whom Mr. Barrow pays monthly child support, is 9.

Fatoumatta Barrow remains extremely supportive of her husband, who she says "helped in community work and individuals in dire need." Alagie Barrow is a peaceful man, who "has never even once been involved in any physical confrontation nor raised his voice to any human being, including myself and my children." With respect to his offense of trying to "overthrow the brutal dictatorship regime in The Gambia, he did it for the love of The Gambia and her people. . .

. For this noble and selfless sacrifice which could have cost him his life, my husband, Alagie
Barrow deserves to be rewarded and not punished."

Since *Booker,* sentencing courts have been called upon to fashion a sentence that not only
encompasses the facts and circumstances of the offense, but addresses the history and
characteristics of the offender as well.  *See, e.g., Pepper v. United States*, 131 S.Ct. 1229, 1240
(2011) ("For the determination of sentences, justice generally requires consideration of more than
the particular acts by which the crime was committed and that there be taken into account the
circumstances of the offense together with the character and propensities of the offender").
(*quoting Pennsylvania ex rel. Sullivan v. Ashe*, 302 U.S. 51, 55 (1937)).  A probationary sentence
here treats this case for what it is:  a single mistake, committed in pursuit of the highest ideals, in
an otherwise exemplary life.  *See, e.g., United States v. Hadash* ,408 F.3d 1080, 1084 (8th Cir.
2005) (affirming probationary sentence where defendant "was simply 'a law abiding citizen who
[did] an incredibly dumb thing'"); *United States v. Howe*, 543 F.3d 128, 132 (3d Cir. 2008)
(affirming probationary sentence because fraud was "an isolated mistake, by all accounts, albeit
an extraordinarily serious one . . . in an honorable and lawful life until this point");

    C.    A Probationary Sentence Properly Reflects the Seriousness of the Offense,
             Provides Just Punishment, and Promotes Respect for the Law

It does not unduly minimize the seriousness of the instant offense to recognize that
against the sweep of run-of-the mill federal cases, this one—in which the defendants acted to free
their homeland from twenty years of despotic persecution at the hands of a sociopathic dictator—
does not occupy even the same ballpark of cases that typically result in prison time.  The
seriousness of an offense is determined by considering the harm inflicted by the crime combined
with the culpability of the defendant.  Here, the only harm inflicted was to the participants in the

coup, some of whom tragically lost their lives. As far as culpability, Mr. Barrow was plainly less blameworthy than the typical gun-toting defendant in federal court. A just punishment is one that recognizes that reality.

Among the factors this Court should consider in assessing the seriousness of the offense are the fact that the defendants are Gambians who were fighting to save their country. Their cause was a righteous one. These were not mercenaries or soldiers of fortune. They were fighting to protect their brethren who could not protect themselves. Simply because they became U.S. citizens does not mean they surrendered their concern for their homeland where, in Mr. Barrow's case, his mother and many of his relatives continue to reside. The defendants acted out of pure humanitarian instincts.

Second, the use of force was employed only as a last resort. Yahya Jammeh has been in power for two decades. The defendants have watched for twenty years while student protesters have been gunned down; political opponents have been killed or disappeared; dissidents have been jailed; citizens have been terrorized and abused; diplomatic entreaties have been unsuccessful; and the international community has been impotent to improve conditions for Gambians. President Kennedy recognized over fifty years ago that "Those who make peaceful revolution impossible will make violent revolution inevitable." After twenty years, the defendants understood that no one would end Jammeh's brutal regime unless they were willing to step up themselves. The genesis of this offense was twenty years of despair, frustration, and suffering.

Third, as noted above, the defendants had no idea they were acting in violation of U.S. law. While ignorance of the law is no excuse, the defendants reasonably understood they had only the reaction of The Gambia to be concerned about. The defendants believed the U.S. would

support their efforts. Prior to the coup, one of the participants had spoken to a military attaché at the U.S. Embassy in Dakar, Senegal, who had assured the group that he would assist in obtaining the support of the U.S. State Department for the new government. The defendants believed the United States supported their efforts. Little wonder then that after the coup failed, some of the defendants sought protection from the U.S. Embassy in Dakar.

Respect for the law is not promoted by simply ramping up sentences so that the public can see that justice is harsh. Rigid adherence to mathematical guideline certainty without regard for the specific facts and circumstances of the case discourages respect for the law. A sentence that reflects the unique mitigating circumstances of an offense and the exemplary life of the defendant promotes respect for the law. The Supreme Court in *Gall* cited approvingly the district court's rationale for sentencing Gall to a probationary term for a serious drug offense, that "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 128 S.Ct. 586, 599 (2007).

That rationale is particularly acute here, where the Gambian diaspora is watching closely to ensure that the Court considers all of the circumstances that make this case so unique. Attached to this memorandum are sentencing letters from many people who know Mr. Barrow and understand why he felt compelled to help his country. They paint a portrait not of a criminal, but of a man of honor and compassion, a man always ready to help others in need.

D.    Probation Will Afford Adequate Deterrence

Research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any)

marginal deterrent effects." Michael Tonry, Purposes and Functions of Sentencing, 34 Crime &

Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as

has every major survey of the evidence." *Id*.; *see also* Zvi D. Gabbay, Exploring the Limits of the

Restorative Justice Paradigm: Restorative Justice and White Collar Crime, 8 Cardozo J. Conflict

Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better

deterrent than its severity.").  Research regarding white collar offenders in particular (presumably

the most rational of potential offenders) found no difference in the deterrent effect between

probation and imprisonment. See David Weisburd et al., Specific Deterrence in a Sample of

Offenders Convicted of White Collar Crimes, 33 Criminology 587 (1995); see also Gabbay,

*supra*, at 448-49 ("[T]here is no decisive evidence to support the conclusion that harsh sentences

actually have a general and specific deterrent effect on potential white-collar offenders.").

These results are not surprising.  Potential criminals are not generally aware of the

penalties for their prospective crimes, do not believe they will be apprehended and convicted, and

simply do not consider sentence consequences in the manner one might expect of rational

decision makers.  That is particularly true here where the defendants had no idea that attempted

regime change in The Gambia implicated U.S. law at all.

This prosecution will have significant deterrent effect because it has made widely known

that the defendants' activities did violate U.S. law. That is the primary deterrence necessary in

this case. But deterrence should not be given undue weight here because violations of the

Neutrality Act are virtually unheard of. American citizens simply do not embark on regime

change in foreign countries. Even if they did, however, given all of the circumstances discussed

above, this is not the case in which the defendants should be harshly punished as some sort of

warning to others. A just sentence is one which properly contemplates what the defendants did

and why. In this case, that sentence is probation.

      E.     A Sentence of Imprisonment is Unnecessary to Protect the Public from Further Crimes of the Defendant

In the context of Mr. Barrow's entire life, this offense was aberrational. He will never again find himself before the Court. He presents a risk to no one.

The Sentencing Commission's own data reveal that all of Mr. Barrow's personal characteristics are strongly correlated with a low risk of recidivism. For example, first offenders have a recidivism rate of only 3.5%, half the rate for offenders with one criminal history point. U.S.S.G., Measuring Recidivism (May 2004). In addition, age over 40, stable employment prior to offense, education, marriage, and abstinence from drug use all reduce the recidivism rate. Yet, none of these factors are deemed relevant by the sentencing guidelines. Significantly, the recidivism rate for defendants sentenced to probation is substantially less than those sentenced to prison (15% vs. 25%) and slightly less than those whose probationary sentence includes a confinement alternative. *Id*. at 13.

      F.     The Kinds of Sentences Available

This Court has complete discretion to fashion an appropriate sentence under 18 U.S.C. § 3553(a). This is even more true than normal because of the many factors outlined above and in the defendants' joint sentencing submission that support a downward variance. The offenses of conviction are Class C and D felonies, making Mr. Barrow eligible for up to five years of probation with appropriate conditions. Mr. Barrow has been on pretrial release for over a year, during which time he has proven himself to be a suitable candidate for probation. The Court can impose, as a condition of probation, a period of confinement in a halfway house or under house arrest. It can also impose a condition of community service.

A community-based sentence is particularly appropriate given Congress's directive to the Sentencing Commission that it "insure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense." 28 U.S.C. § 994(j). Congress issued this directive in the belief that "sentencing decisions should be designed to ensure that prison resources are, first and foremost, reserved for those violent and serious criminal offenders who pose the most dangerous threat to society," and that "in cases of nonviolent and nonserious offenders, the interests of society as a whole as well as individual victims of crime can continue to be served through the imposition of alternative sentences, such as restitution and community service." See Pub. L. No. 98-473, § 239, 98 Stat. 98 Stat. 1987, 2039 (1984) (set forth at 18 U.S.C. § 3551 note). Although Mr. Barrow's offense is technically a crime of violence, for all the reasons noted above, this directive remains applicable here.

G.    A Sentence Well Grounded in the Unique Facts of this Case Does Not Create Unwarranted Sentencing Disparity

Given that violations of the Neutrality Act are almost unheard of, so rare there is not even a guideline that applies, there is no sentencing "heartland" this Court can look to for guidance. This case is so unique that sentencing disparity is a non-issue. What is clear is that unwarranted sentencing disparity can be caused either by treating like cases differently or by treating different cases alike. The foregoing discussion makes clear that this case is not typical. To lump Mr. Barrow into the same guideline range as other offenders who, for example, use a gun during a Hobbes Act robbery or a sexual assault, without regard to the facts that—he was acting to free his countrymen from oppression; he did not act for personal benefit; he had no idea his conduct violated U.S. law; he served honorably in the U.S. military for over a decade; the offense was

borne out of twenty years of frustration and persecution; the offense was an aberration in an otherwise blameless life; and his risk of recidivism is miniscule—would not reduce disparity. It would simply ignore reality. None of these factors is considered by the sentencing guidelines. A downward variance from the guidelines to reflect these factors does not cause *unwarranted* sentencing disparity. Rather, such a sentence would be tailored to fit both the offender and the crime, incorporating the § 3553(a) factors as that statute requires. In the face of the unique circumstances of this case, rigid adherence to the sentencing guidelines does not promote uniformity or comply with the mandate of §3553(a). After all, "a foolish consistency is the hobgoblin of little minds." Ralph Waldo Emerson.

        H.      Need for Restitution

Because there was no loss to the brutal regime of The Gambia, there is no restitution due in this case.

## CONCLUSION

The § 3553(a) factors speak with a single voice in this case: a term of probation is the appropriate disposition. Whatever one's personal feelings about Mr. Barrow's offense conduct, there is no question that he acted at great personal sacrifice for the betterment of his fellow man. His conduct may have been criminal, but it was nonetheless heroic. And, in the context of his entire life, that isolated mistake, made not out of greed but from the loftiest ideals bred in him by the U.S. military, does not warrant the harsh penalty of imprisonment. The defense asks the

Court to impose a sentence of five years' probation, together with those conditions the Court

determines are "sufficient, but not greater than necessary" to satisfy the purposes of sentencing.

Dated: April 27, 2016

                                      Respectfully submitted,

                                      *s/ Robert D. Richman*
ROBERT D. RICHMAN
Attorney ID No. 226142
P.O. Box 16643
St. Louis Park, MN  55416
(651) 278-4987

                                      *s/ Joseph S. Friedberg*
JOSEPH S. FRIEDBERG
Attorney ID No. 32086
701 Fourth Avenue South, Suite 300
Minneapolis, MN  55415
(612) 339-8626

                                      Attorneys for Defendant