UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---------------------------------------------------------
                              )
United States of America,     )  File No. 15-CR-35
                              )          (RHK/HB)
        Plaintiff,            )
                              )
vs.                           )  St. Paul, Minnesota
                              )  May 10, 2016
(1) Cherno Njie,              )  8:00 a.m.
(2) Alagie Barrow,            )
(3) Banka Manneh,             )
                              )
        Defendants.           )
                              )
---------------------------------------------------------
                              )
United States of America,     )  File No. 15-CR-28
                              )          (RHK)
        Plaintiff,            )
                              )
vs.                           )  St. Paul, Minnesota
                              )  May 10, 2016
Papa Faal,                    )  8:00 a.m.
                              )
        Defendant.            )
                              )
---------------------------------------------------------

BEFORE THE HONORABLE RICHARD H. KYLE
UNITED STATES DISTRICT COURT JUDGE

*   *   *   **REDACTED TRANSCRIPT**   *   *   *

**(EVIDENTIARY HEARING)**

Proceedings recorded by mechanical stenography;
transcript produced by computer.

LORI A. SIMPSON, RMR-CRR
(651) 848-1225

1    <u>APPEARANCES</u>

2       For the Plaintiff:           U.S. Attorney's Office
                                     CHARLES J. KOVATS, JR., ESQ.
3                                    600 U.S. Courthouse
                                     300 South Fourth Street
4                                    Minneapolis, Minnesota 55415

5                                    U.S. Department of Justice
                                     National Security Division
6                                    RICHARD S. SCOTT, ESQ.
                                     Tenth Floor
7                                    600 East Street Northwest
                                     Washington, D.C. 20004

8
        For Defendant Cherno        Gaskins, Bennett, Birrell,
9       Njie:                        Schupp, LLP
                                     ANDREW S. BIRRELL, ESQ.
10                                   Suite 2900
                                     333 South Seventh Street
11                                   Minneapolis, Minnesota 55402

12      For Defendant Alagie        Joseph S. Friedberg, Chartered
        Barrow:                      JOSEPH S. FRIEDBERG, ESQ.
13                                   Suite 300
                                     701 Fourth Avenue South
14                                   Minneapolis, Minnesota 55415

15                                   ROBERT D. RICHMAN, ESQ.
                                     P.O. Box 16643
16                                   St. Louis Park, Minnesota 55416

17      For Defendant Banka         Lindquist & Vennum, PLLP
        Manneh:                      MARK D. LARSEN, ESQ.
18                                   Suite 4200
                                     80 South Eighth Street
19                                   Minneapolis, Minnesota 5542

20      For Defendant Papa          Office of the Federal Defender
        Faal:                        ANDREW H. MOHRING, ESQ.
21                                   Suite 107
                                     300 South Fourth Street
22                                   Minneapolis, Minnesota 55415

23      Court Reporter:             LORI A. SIMPSON, RMR-CRR
                                     Suite 146
24                                   316 North Robert Street
                                     St. Paul, Minnesota 55101

25

1                          <u>**I N D E X**</u>

                                                                <u>PAGE</u>

2  <u>CHERNO NJIE</u>
       Direct Examination by Mr. Birrell                         10
3      Cross Examination by Mr. Kovats                           36

4  <u>PAPA FAAL</u>
       Direct Examination by Mr. Mohring                         41

5

6

   <u>DEFENDANTS' EXHIBITS</u>                                   <u>REC'D</u>
7      1                                                          8
       2                                                         56
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      **P R O C E E D I N G S**

2                      **IN OPEN COURT**

3          (Defendants present)

4              THE COURT:  Okay.  The matter on the Court's

5      calendar at this time is United States of America vs. Njie,

6      Barrow, Manneh, and Faal, Criminal File No. 15-35 and

7      Criminal File 15-28.

8              Let's start with the appearances for the United

9      States.

10             MR. KOVATS:  Good morning, Your Honor.  Assistant

11     United States Attorney Charles Kovats and Trial Attorney

12     Richard Scott for the United States.

13             THE COURT:  Good morning to both of you.

14             MR. SCOTT:  Good morning.

15             THE COURT:  For the defendants?

16             MR. BIRRELL:  Good morning, Your Honor.  Andy

17     Birrell and Cherno Njie.

18             MR. RICHMAN:  Robert Richman and Joseph Friedberg

19     for Alagie Barrow, who is also present.

20             THE COURT:  Mr. Mohring.

21             MR. MOHRING:  Andrew Mohring representing Papa

22     Faal, who is here with us this morning as well.

23             THE COURT:  Mr. Larsen.

24             MR. LARSEN:  Mark Larsen for Banka Manneh, who is

25     present before the Court.

1          THE COURT:  Good morning to all of you.  We are

2     here for what is on the docket called an evidentiary

3     hearing.  So why doesn't somebody tell me what the order of

4     the hearing is going to be.

5          Mr. Mohring.

6          MR. MOHRING:  Your Honor, what we would like to do

7     this morning is first to play what has been marked as

8     Defendants' Exhibit 1, which is a sentencing video, copies

9     of which have been provided to the Court and the prosecution

10    and the Probation Office.

11         THE COURT:  Is that *The Gambia Documentary*?

12         MR. MOHRING:  Yes.

13         THE COURT:  Okay.

14         MR. MOHRING:  We will then seek to introduce

15    testimony from two of the defendants and then what we would

16    like to do, Your Honor, as communicated to the Court, is to

17    present argument about common issues that apply to all of

18    the defendants.  There are a series of guideline questions,

19    again, that apply to each of these men.

20         And so that's the ground that we would propose to

21    cover today before then proceeding tomorrow to the actual

22    just individual case-by-case sentencings.

23         THE COURT:  Okay.

24         MR. MOHRING:  We have a second exhibit that we

25    will be introducing.  I can give a copy to the Court, Your

1      Honor, now if the Court wishes.  It's a document.  Just so

2      you have it.  But we will be moving the introduction of

3      this.  We listed it as an exhibit.  If I may approach?

4              THE COURT:  Sure.

5              MR. MOHRING:  There are two copies.

6              THE COURT:  This is marked as Defendants'

7      Exhibit 2.

8              MR. MOHRING:  Yes, Your Honor.  And we'll get to

9      that and we'll discuss that over the course of this morning.

10             THE COURT:  So we're going to start with the

11     video, then?

12             MR. MOHRING:  Yes.

13             THE COURT:  For the record, I was furnished with a

14     copy of the video, which is entitled *The Gambia Documentary*,

15     a few days ago.  So I have viewed this prior to today, but

16     I'll take another look this morning.

17             MR. MOHRING:  Okay.

18             THE COURT:  Anything from the government?

19             MR. KOVATS:  No, Your Honor, other than to say we

20     have communicated with Mr. Mohring and defense counsel about

21     the schedule and so we're prepared to adopt that same

22     schedule and we'll proceed as Mr. Mohring suggested so long

23     as it's okay with the Court.

24             THE COURT:  Fine with me so far.  We'll see how it

25     goes.

1          Mr. Mohring.

2          MR. MOHRING:  Your Honor, I have it on the DVD.  I

3     don't know if the Court has the DVD keyed up on the system.

4          THE COURT:  I don't, but I think I am about to

5     have it keyed up.  This is beyond my pay grade here.

6        (Pause)

7          THE COURT:  Any of the counsel have any expertise

8     of how to get this thing working?  Because I do not.

9          MR. MOHRING:  We also have it on a laptop, Your

10    Honor.

11        (Pause)

12          MR. MOHRING:  Let me just try hitting the play

13    button.

14          THE COURT:  Okay.

15        (Pause)

16          THE COURT:  Are we expecting any more visitors in

17    the courtroom, the gallery, that anybody knows of?  Because

18    if this goes down, we can go back up to 7.  The only

19    difference between 7 and here is there's one more row of

20    seats and I think we have probably got -- I think they could

21    fit up there almost just as easily.

22        (Pause)

23        (Video played)

24          THE COURT:  Can we stop it just for one minute.

25    If any of you who are on that side of the courtroom

1    (indicating), if there is any room on the other side, you

2    probably have a better view of the big screen.

3              MR. MOHRING:  There's also a screen --

4              THE COURT:  That's right, we've got that screen

5    too.  But if anybody wants to look at the big screen, they

6    can move over.

7              Okay.  Without further ado, let's get going, then.

8         (Video played)

9              MR. MOHRING:  I apologize, Your Honor.

10        (Pause)

11        (Video played)

12        (Pause)

13             THE COURT:  Why don't we stop it for a minute and

14   let me see counsel at the bench.

15        (Discussion off the record at sidebar)

16        (Video played)

17             MR. MOHRING:  Thank you, Your Honor.  With that,

18   the defense moves the admission of Exhibit Number 1, the

19   video.

20             THE COURT:  Any objection?

21             MR. KOVATS:  No, Your Honor.

22             THE COURT:  Exhibit 1 will be received.

23             So what's on the calendar now or next?  We're

24   going to take a break, but I just want to see what's ahead.

25             MR. BIRRELL:  The next thing that will happen is

1    that Mr. Cherno Njie will be called to testify.

2         THE COURT:  Why don't we take our morning recess,

3    then.  Let's make it 20 minutes.  We'll come back at quarter

4    to 10:00, I guess.

5         For those of you who are unfamiliar with the

6    building, if you go out that door (indicating) and take

7    a right and then take another right, there are bathrooms

8    down the hallway, I think both men and women.

9         Be back in 20 minutes.

10        MR. BIRRELL:  Thank you, Judge.

11        MR. MOHRING:  Thank you, Your Honor.

12    (Recess taken at 9:22 a.m.)

13                        *    *    *    *    *

14    (9:46 a.m.)

15                      **IN OPEN COURT**

16        THE COURT:  Mr. Birrell.

17        MR. BIRRELL:  Thank you, Your Honor.  We call

18    Cherno Njie.

19        THE COURT:  If you would come up here, sir, and we

20    will swear you in.  If you would raise your right hand.

21    (Witness sworn)

22        THE COURT:  Take the witness chair, please.  We'll

23    start your testimony by having you give us your full name

24    and if you would please spell your last name.

25        THE WITNESS:  Cherno Njie, N-j-i-e.

1        THE COURT:  Counsel, you may proceed.

2        MR. BIRRELL:  Thank you.

3                    **(Cherno Njie)**

4                  **DIRECT EXAMINATION**

5   BY MR. BIRRELL:

6   Q.  Mr. Njie, let's begin with a little bit of a timeline.

7   You were born in 1957; is that right?

8   A.  That is correct.

9   Q.  And you were born in The Gambia?

10  A.  In The Gambia, in Banjul.

11  Q.  Banjul, which is the capitol city?

12  A.  The capitol, that's correct.

13  Q.  Okay.  And then in 1965 The Gambia became independent of

14  Britain; is that right?

15  A.  That is correct.

16  Q.  And then in 1970 The Gambia became a republic?

17  A.  That is correct.

18  Q.  All right.  Then you left The Gambia in 1983?

19  A.  That is correct.

20  Q.  And came to the United States?

21  A.  That's correct.

22  Q.  And you didn't return until 1996; is that right?

23  A.  That's right.

24  Q.  Now, the judge has a lot of this information already in

25  written form, but we'll work together and summarize it here.

1              So what happened was you finished high school in

2       The Gambia?

3       A.   That is correct.

4       Q.   And then you worked in a bank for about four years?

5       A.   That's right.

6       Q.   Okay.  And then you came to the United States for your

7       college education?

8       A.   That is correct.

9       Q.   And ended up living in Austin, Texas, and graduating

10      from the University of Texas at Austin with special honors;

11      is that right?

12      A.   That is correct.

13      Q.   Okay.  Then you worked for the government of the State

14      of Texas for a bit?

15      A.   That's right, for nine years.

16      Q.   What did you do there, briefly?

17      A.   Well, I administered a program.  It's a housing program

18      called the Federal Low-Income Housing Tax Credit Program.

19      Q.   Then you started some businesses of your own?

20      A.   I resigned from the State to open my own consulting

21      firm, that's correct.

22      Q.   And what kind of businesses do you own?

23      A.   I own a real estate development and construction

24      business.

25      Q.   And during the period of time we've been discussing, you

1    were married and had a son who is now 25?

2    A.   25, that's correct.

3    Q.   And he's an engineer who lives in Texas?

4    A.   That's right, mechanical engineer.

5    Q.   Mechanical engineer.

6            And you have a new family -- newer family?

7    A.   A newer family.  Three girls.

8    Q.   And what are their ages?

9    A.   Newborn and a one-year-old and a three-year-old.

10   Q.   What we're interested to help the judge understand

11   through your testimony is how you came to be involved in

12   this matter.  Okay?

13   A.   Yes.

14   Q.   And would you describe yourself as a political person at

15   the time you came to the United States?

16   A.   Well, I was always interested in politics and ideas, and

17   that started in The Gambia.  I wasn't interested in parties

18   and politics as such, but the ideology of the day, so to

19   speak, which was either communism, socialism, or capitalism.

20           I grew up in the '70s when the East/West conflict

21   was very fierce and there was the competition with the

22   communist block.  And then there was the Non-Aligned

23   Movement in Gambia and Gambia was part of the Non-Aligned

24   Movement.  A lot of Asian and African countries subscribed

25   to nonalignment.

1              THE COURT:  Let me just stop you for just a

2      moment.  Would you try to speak up just a little louder and

3      maybe get -- is the green light on?

4              THE WITNESS:  All right.

5              THE COURT:  That's better.

6              THE WITNESS:  Thank you, Your Honor.

7              MR. BIRRELL:  I think it is on, Your Honor.

8      BY MR. BIRRELL:

9      Q.  All right.  So did there come a time when you became

10     more active in political thinking and movements as it

11     pertains to The Gambia?

12     A.  Yes.  It's an evolutionary process.  When I came to the

13     U.S., for the most part I concentrated on working here and

14     building a family.  Events in The Gambia in the '90s -- the

15     '94 coup, I had left the Gambia 11 years before that

16     happened, so I was paying attention, but intermittently, not

17     very often.

18     Q.  So the '94 coup was the military coup under which Jammeh

19     came to power?

20     A.  That is correct.

21     Q.  And at the time that that occurred, you had family in

22     The Gambia?

23     A.  Yes, and still do.

24     Q.  Who was -- the family that you have has lived there this

25     entire time; is that right?



```
1    Q.  So you live in Texas and you've done very well, true?

2    A.  Yes, I have.

3    Q.  Okay.  You have, safe to say, millions of dollars?

4    A.  That is correct.

5    ████ ████████████████████████████████████████████

6    ████████████████████████████

7    ██ ██████████████████████████████████████████████

8    ████████████████████████████████████████████████████

9    ██████████████████████████████████████████████████

10   ████████████████████████████████████████████████████

11   ██████████████

12   Q.  Now, later in the, say, early middle 2000s did there

13   come a time when you started to meet with some other -- meet

14   with, talk with other Gambians in the diaspora?

15   A.  Yes, that is correct.  The catalog of atrocities in

16   The Gambia is long and as somebody who grew up in The Gambia

17   who remembered The Gambia as a peaceful, stable country,

18   this became an issue of great concern.  I had been paying

19   attention to what's been going on and for me the breaking

20   point really came around 2012 with the execution of those

21   nine prisoners.

22   Q.  Let's talk about that for a minute just so we make sure

23   we're being complete here.  So this occurred in about

24   August, was it?

25   A.  August 2012, that's correct.
```

1    Q.  And tell the judge what happened.

2    A.  Well, the president decided to execute nine prisoners

3    who were being held in prison for various crimes without any

4    due process and this was done on a whim, basically.  And

5    what was striking about this is that the bodies of the

6    prisoners were not even returned to the families for burial

7    and there was a lot of speculation that he had used them --

8    he believed in witchcraft and dabbles into a cult and all

9    kinds of issues, so there was a lot of rumor that, and I

10   believe some of those, that he had used some of them for

11   those kinds of rituals.  So that really for me was the

12   seminal moment.  It got to me real hard.

13   Q.  So what happened next in the progression of things here,

14   then?

15   A.  Well, I reached out to a number of Gambians and I

16   convened a meeting in Austin of some prominent Gambians who

17   had been active in the opposition movement to the president.

18   Q.  When you say "convened," where was the meeting?

19   A.  This was in Austin.

20   Q.  Which is your home?

21   A.  My home, that's correct.

22   Q.  And why was it held in Austin?

23   A.  Well, I was the convener of the meeting and it was also

24   because Austin doesn't have a lot of Gambian community, in

25   fact, I'm the only family of Gambia that I know of, so the

1    purpose of the meeting is to provide a safe place where

2    Gambians can meet and talk about things.  So I convened the

3    meeting.

4    Q.  So who came?

5    A.  There were a dozen Gambians across the country and from

6    the United Kingdom.

7    Q.  And this meeting occurred at a hotel?

8    A.  At a hotel, yes.

9    Q.  And so how many days was the meeting?  Do you remember?

10   A.  Two days.

11   Q.  What took place at the meeting?

12   A.  Discussions about background information.  I wanted to

13   find out -- because I had been gone for a while, I wanted to

14   re-engage with the Gambian community to find out what can be

15   done to change matters back home.  So the first thing I did

16   was to talk to the people who have been active in the arena

17   and find out what they know and perhaps they can guide me in

18   formulating a plan of action.

19   Q.  What did you learn had been going on?

20   A.  What I learned was that various organizations had been

21   working to put pressure on the regime through the imposition

22   of economic sanctions, for example, through the State

23   Department and also through the EU and through the British

24   government as well, as well as in the west African region

25   through ECOWAS.  I also learned that various organizations

1    had been working together to help strengthen the opposition

2    parties back home.  So it was a wealth of information that I

3    needed to put my hands around and to understand what's been

4    going on.

5    Q.  Did there come a time when you met Jxxxx?

6    A.  Nxxxx?

7    Q.  Yes.

8    A.  Yes, I met Nxxxx.

9    Q.  Just so the Court understands, he is the brother of the

10   woman who we saw speaking a lot on the DVD?

11   A.  Nxxxx is the brother of Sxxxx Jxxxx, that's correct.

12   Q.  And Nxxxx was killed, is that what happened?

13   A.  That is correct, he was killed in Gambia.

14   Q.  And so you were introduced to him?

15   A.  That is correct, I was introduced to Nxxxx by Nxxxx's

16   sister, Sxxxx.

17   Q.  And then did you talk and meet, or how did you

18   communicate at first?

19   A.  Yes, we exchanged text messages and talked on the phone.

20   Q.  And what did he tell you?

21   A.  Well, we had -- he explained to me his passion for

22   working towards changing The Gambia and some of the

23   activities he's been involved with with others of like mind.

24   Eventually we decided to meet and discuss things

25   face-to-face.

1    Q.  And where did you meet?

2    A.  We met in Austin.

3    Q.  He came to see you?

4    A.  He came to see me, that's correct.

5    Q.  And did he give you any information when he came to see

6    you?

7    A.  Yes, he did.  He talked to me about a group that he was

8    a part of that had been formed and was working towards

9    ousting Jammeh, essentially.

10   Q.  Did he tell you how long the group had been together?

11   A.  No, he didn't say specifically how long, but he said the

12   group was formed.

13   Q.  And he was a military man; is that right?

14   A.  He was a captain in the Kentucky National Guard.

15   Q.  And did he ask you to do anything in connection with

16   this?

17   A.  He indicated to me that they were looking for financial

18   assistance, yes.

19   Q.  Did he ask for a certain amount of money or what did he

20   say to you?

21   A.  Well, he said they were putting a budget together and

22   they will let me know what that was.

23   Q.  And then did there come a time when you received the

24   budget?

25   A.  Yes, yes, I did eventually get the budget of the amount

1    required.

2    Q.  Did you have another meeting with him?

3    A.  I had another meeting with him, yes, at my residence as

4    well.

5    Q.  And that was in January of 2014?

6    A.  Well, the initial meeting was January of 2014.  There

7    was a subsequent meeting in the summer of 2014.

8    Q.  Okay.  And through him did you meet Mr. Sanneh?

9    A.  That's correct.  I eventually met Sxxxxx also at my

10   residence later that year in 2014.

11   Q.  All right.  Sxxxxx was another person who went to

12   The Gambia and was killed?

13   A.  That's correct.  Sxxxxx was a lieutenant colonel in the

14   Gambia National Army.

15   Q.  Let's talk about him a little bit.

16            THE COURT:  Why don't you spell his last name at

17   least for the reporter.

18            MR. BIRRELL:  Thank you, Your Honor.  It's

19   S-x-x-x-x-x.

20            THE COURT:  Thank you.

21   BY MR. BIRRELL:

22   Q.  Colonel Sxxxxx was a graduate of Sandhurst; is that

23   right?

24   A.  That is correct.

25   Q.  And also a graduate of the U.S. War College?

1    A.  That's correct.

2         THE COURT:  And Sandhurst is the equivalent of our

3    West Point?

4         THE WITNESS:  That's correct.  It's the U.K.,

5    British equivalent of West Point.

6    BY MR. BIRRELL:

7    Q.  And Sxxxxx lived in Baltimore, Maryland, near

8    Washington?

9    A.  Yes.

10   Q.  Can you explain to Judge Kyle your understanding and

11   impression of Sxxxxx and what you thought of him.

12   A.  Well, Sxxxxx was a very impressive military officer and

13   he attended Sandhurst and National War College and did his

14   master's here.  And I've met some other Gambian military

15   folks before, but he was by far the most impressive in terms

16   of his extensive contacts within the Gambian military.  He

17   had been head of the training school, became intimately

18   familiar with the workings of the Gambian National Army, and

19   also commanded the elite presidential guard for Yahya Jammeh

20   before his dismissal.  So he had a lot of credibility.

21   Q.  Okay.  So what happened was Sxxxxx was -- he was the

22   head of Jammeh's guards?

23   A.  Presidential guard, that's correct.

24   Q.  So he was -- the presidential guard is essentially the

25   personal guard of Jammeh?

1    A.  Well, yes, that's right.

2    Q.  Okay.  And then he, Sxxxxx, had some sort of falling out

3    with Jammeh and left the country, left The Gambia in 2012?

4    A.  That's correct, yes.

5    Q.  And came to the United States?

6    A.  Yes.

7    Q.  And you learned that the person in charge of this

8    enterprise was Sxxxxx; is that what happened?

9    A.  Yes, he was the military branch behind it.

10   Q.  Now, you also learned, from Sxxxxx and the others,

11   learned that Sxxxxx was in communication with a military

12   attaché; is that right?

13   A.  That is correct.

14   Q.  And tell the Court what you learned about who this

15   person was and what was the communication.

16   A.  Sxxxxx reported to me his meeting with the U.S. military

17   attaché in Senegal, who is based in Senegal, that is.  The

18   meeting took place in Washington, D.C. area.  This would

19   have been about late summer of 2014.

20   Q.  What was your understanding of the role of the military

21   attaché at the Senegal Embassy?

22   A.  Well, my understanding was that this was a cover for the

23   CIA, basically.

24   Q.  What did Sxxxxx tell you --

25          MR. KOVATS:  Your Honor, I'm going to just object

1    as to speculation on that point.

2              THE COURT:  The answer will stand, but I

3    understand your concerns.

4    BY MR. BIRRELL:

5    Q.  We're letting the Court know what your understandings

6    were.

7    A.  Yes.

8    Q.  So what was it that Sxxxxx told you about the

9    conversation -- first of all, how many conversations did he

10   have with this military attaché?

11   A.  Sxxxxx indicated that he had been in touch with the

12   attaché since he left the country to come to the U.S.

13   Q.  So for two years or so?

14   A.  Yeah, at least two years and they've developed a

15   relationship.  He indicated the attaché was very helpful

16   during his transition to the U.S. to seek political asylum

17   after his dismissal.

18   Q.  I'm not sure about this.  Was it the case that Sxxxxx

19   and this military attaché had attended the War College

20   together?

21   A.  I'm not sure about that.

22   Q.  Okay.  In any event, Sxxxxx came to the United States,

23   sought political asylum, and apparently received it; is that

24   your understanding?

25   A.  He was in the process of getting that, yes.

1    Q.  Okay.  What did Sxxxxx report to you about his

2    conversations with the military attaché?

3    A.  Sanneh reported to me that he had a meeting with the

4    attaché in the Washington, D.C. area and the purpose of the

5    meeting was basically to inform him, that is, the attaché,

6    of an ongoing plot to overthrow the government.

7    Q.  And so Sxxxxx told you he informed the military attaché

8    of that?

9    A.  That is correct.

10   Q.  And did he, Sxxxxx, tell you what the response was?

11   A.  Yes.  He said the attaché asked him whether he was

12   involved in it and he answered in the affirmative --

13   Q.  Told him --

14   A.  -- that he was.

15   Q.  -- right?

16   A.  Yes.

17   Q.  Did he give -- did Sxxxxx give you any other further

18   information about what the attaché said?

19   A.  Yes.  He said he asked the attaché what he thought the

20   U.S. reaction would be and he said the attaché said that the

21   U.S. will accommodate the new regime coming in.

22   Q.  Now, you and I reviewed the discovery information

23   provided from the government, right?

24   A.  Yes, that's correct.

25   Q.  Okay.  And we learned that in October of 2014 the FBI

1    received a report that Sxxxxx was involved in a planned coup

2    to overthrow The Gambia; is that right?

3    A.  That is correct.

4    Q.  Okay.  Which is consistent with what you're telling me,

5    right?

6    A.  That's right.

7    Q.  Okay.  Then in terms of some of the other information

8    that you learned, without giving a name, did there come a

9    time when you learned that one of the people involved in

10   Sxxxxx's operation, planned operation here, was an

11   active-duty U.S. military person?

12   A.  That is correct.

13   Q.  And that information you learned from a person involved

14   in the planning?

15   A.  Yes.

16   Q.  And did there come a time, again without using the name,

17   where you actually spoke to this person?

18   A.  I spoke to the active-duty military personnel, that's

19   correct.

20   Q.  Did the fact that you believed and learned that there

21   was an active-duty U.S. military person involved in this

22   influence your thinking as to the information you were

23   receiving from Sxxxxx about his conversations?

24   A.  It did, yes.

25   Q.  Can you explain to the Court how that happened.

1    A.  Well, I believed Sxxxxx's report to me that he had this

2    conversation with the military attaché, and in effect the

3    way he described it to me was he got a green light.  He

4    thought that this was a project the U.S. government would

5    support.  My talking directly with the active-duty military

6    personnel also gave me an indication that we could have

7    support from the U.S. government.

8    Q.  Why was that?  Explain what you were thinking.

9    A.  Well, my thinking is the relationship between Washington

10   and Banjul could scarcely be any worse and as somebody who

11   has followed the relationship over time, it has been a very

12   poisonous relationship entirely based on the appalling human

13   rights records of the Gambian president.

14          And the operating hypothesis is that nobody in the

15   U.S. government will shed a tear if Jammeh were overthrown.

16   Certainly if he were overthrown and held prisoner, I don't

17   think the United States government would call for his

18   reinstatement.

19          So Sxxxxx's conversation as well as my

20   conversation with this active-duty military guy bolstered my

21   own thinking that this is an enterprise that the U.S.

22   government would support and supported.

23   Q.  All right.  Originally your role, as you're relating it,

24   was to provide money?

25   A.  That is correct.

1    Q.  And your role changed or expanded, let's say?

2    A.  Yes.

3    Q.  And was this done at the request of Colonel Sxxxxx?

4    A.  Yes.  My role was primarily as a financier of the

5    project, and we began to talk about what was to happen after

6    the fact.  After we were successful in getting rid of the

7    regime, then what comes next.  There was a vision already in

8    place regarding what should come up.  There was supposed to

9    be a transitional government.  There was supposed to be

10   fresh elections, a new constitution, some commissions of

11   inquiry for human rights, et cetera.  So the framework was

12   already in place when I joined in and when I started talking

13   to Sxxxxx, he asked that I should consider the position of

14   an interim president.

15   Q.  Did he tell you why he thought that would be a good

16   thing for you to do?

17   A.  Well, his reasons were that he had talked to the other

18   guys and felt that I was a neutral figure, I was a fresh

19   face without any partisan links, and I would be an honest

20   broker during that interim period and that they didn't want

21   any military folks heading this project.

22   Q.  And the understanding was you wouldn't stand for

23   election if you --

24   A.  That is correct.  This was an interim period in which

25   whoever served will not be eligible to stand for any

1    elections.

2    Q.  And so this thinking then required that you would travel

3    to The Gambia?

4    A.  That's correct.

5    Q.  And is it correct that the reason you were willing to do

6    this was because you believed in Sxxxxx?

7    A.  I believed absolutely in Sxxxxx and the entire team.  He

8    was an impressive guy.  I wouldn't have taken the risks that

9    I did if I didn't believe that this was an enterprise that

10   would succeed, and the confidence I had in him was absolute.

11   Q.  So you did go to The Gambia?

12   A.  Yes, I did.

13   Q.  And you traveled under your own name?

14   A.  Yes.

15   Q.  And eventually you -- well, you went to Senegal first?

16   A.  Yes.

17   Q.  Which is right across the street, so to speak, from

18   The Gambia?

19   A.  That is correct.

20   Q.  Okay.  And did you meet Sxxxxx in Senegal?

21   A.  Yes, we met in Senegal.

22   Q.  When you met with Sxxxxx in Senegal, did he report to

23   you that he had been interviewed by the FBI?

24   A.  Yes, he did let me know that he was interviewed by the

25   FBI before he left on his flight to Senegal.

1    Q.  And, again, you and I reviewed the discovery from the

2    government and we learned that some agents from the

3    Baltimore office of the FBI did interview Sxxxxx at his home

4    December 16, 2014?

5    A.  That's correct.

6    Q.  And they did talk with him about whether he was planning

7    to overthrow the government of The Gambia or something

8    similar?

9    A.  That is right.

10   Q.  And he told them he was not?

11   A.  He told them he was going to visit his son in Dakar.

12   Q.  Which is the capitol of Senegal?

13   A.  Of Senegal, that's correct.

14   Q.  And so Sxxxxx reported this same conversation to you in

15   Senegal?

16   A.  That's right.

17   Q.  Did Sxxxxx tell you whether or not he had any other

18   conversations with federal law enforcement officers?

19   A.  No, no.

20   Q.  And so what happened is that the members of the group

21   got together in The Gambia?

22   A.  That's right.

23   Q.  And do you remember what day you all were together

24   first?

25   A.  We left Dakar I believe on the 26th, the day after

1    Christmas, to go to The Gambia.

2    Q.  So this is December 26, 2014?

3    A.  That's correct.

4    Q.  And were you together in a house or a couple houses, or

5    how did it work?

6    A.  We were in a house together.  I think Sxxxxx was staying

7    there as well as Jxxxx.  They were other houses somewhere

8    else where the other guys were staying.

9    Q.  Now, what was the command structure as it related to the

10   group when you're in The Gambia?

11   A.  Well, Sxxxxx had control over the group from a military

12   standpoint.  I mean, this was, after all, a military

13   operation.  Because of the extensive contacts he had in the

14   Gambian military, he was the intermediary.  He was the guy

15   who decided what should be done and how and when.

16   Q.  So Sxxxxx was the operational commander of the group?

17   A.  That is correct.

18   Q.  And he was receiving information from people inside the

19   Gambian government?

20   A.  That is correct.

21   Q.  And we're not going to talk about who they are?

22   A.  That is correct.

23   Q.  Some of them have been arrested, right?

24   A.  Yes.

25   Q.  All right.  And based on this, then Sxxxxx made a

```
 1    decision about what should happen next?

 2    A.  Yes.

 3    Q.  What did he decide first?

 4    A.  Well, the operation was to ambush initially the

 5    president's motorcade and hold him prisoner.

 6    Q.  Okay.

 7    A.  And that plan was shelved after we learned that he would

 8    be leaving town.

 9    Q.  Jammeh was leaving the country?

10    A.  Was leaving the country, that is correct.

11    Q.  And when did you all learn that fact?

12    A.  We learned that I believe a day or two before he left,

13    actually.

14    Q.  Do you know what day he left?

15    A.  I think around the 27th.

16    Q.  What was the next thought as far as a plan?

17    A.  Well, the next thought was to try and seize the State

18    House.

19    Q.  What did Sxxxxx say about why he thought that would be

20    an attainable goal?

21    A.  Well, that was based on his own assessment of the

22    intelligence and the conversations he was getting with his

23    sources within the ranks.  These were, after all, men he

24    commanded.

25    Q.  And were presumably loyal to him?
```

1    A.  That is correct.

2    Q.  And so there was a first beginning of an attempt?

3    A.  There was an attempt on the 29th to take over the State

4    House.  That attempt was thwarted.

5    Q.  What happened?

6    A.  Well, the report we got back was that they decided not

7    to approach because it was too dangerous.  They apparently

8    didn't get the kind of intelligence that they were looking

9    for.

10   Q.  So who made the decision to abort the mission?

11   A.  Sxxxxx made that decision.

12   Q.  And where were you when this mission was occurring?

13   A.  I was in a different location basically waiting for word

14   as to the outcome.

15   Q.  So the 29th began, but didn't really get going; is that

16   what happened?

17   A.  That is correct.  The mission was aborted.

18   Q.  So what happened next?

19   A.  Well, they came back and decided that they will go and

20   see if they can do that the following day.

21   Q.  Okay.  That was December 30th?

22   A.  That is correct.

23   Q.  And what happened was that they did make that attempt?

24   A.  They did, that's correct.

25   Q.  And you were in a remote location --

```
 1    A.  Yes.

 2    Q.  -- more remote of a location?

 3            In a house?

 4    A.  Yes.

 5    Q.  And the plan was that if it worked, then you would go

 6    and offer yourself up as an interim person and begin the

 7    transition to a full democracy?

 8    A.  That is correct.

 9    Q.  But that's not what happened?

10    A.  No.

11    Q.  What happened?

12    A.  Well, what happened was they met heavy resistance at the

13    State House and there was a shoot-out in which we lost three

14    of our men.

15    Q.  And what were their names?

16    A.  Lxxxx Sxxxxx, Nxxxx Jxxxx, and Axxxxxx Nxxxx.

17    Q.  And so what did you do then?

18    A.  Well, after we received the report that the attempt had

19    failed, we left the location where we were into Senegal and

20    eventually back to the U.S.

21            THE COURT:  Counsel, could you try to keep your

22    voice up or get a little closer to the microphone.

23            MR. BIRRELL:  Sure, Judge.  Thank you.

24    BY MR. BIRRELL:

25    Q.  So you went to Senegal and flew back to the United
```

```
 1    States?
 2    A.  That is correct.
 3    Q.  And then when you arrived, you were arrested and the
 4    court proceedings began?
 5    A.  That is correct.
 6             THE COURT:  When were you arrested?  Do you
 7    remember the date?
 8             MR. BIRRELL:  January --
 9             THE WITNESS:  January 2nd, I believe.
10             THE COURT:  Thank you.
11             THE WITNESS:  2015.
12    BY MR. BIRRELL:
13    Q.  So we're asking the judge to give you a sentence of
14    probation, right?
15    A.  Yes.
16    Q.  I want you to explain to the judge why he could feel
17    confident that you will continue to be a law-abiding
18    American citizen.
19    A.  Your Honor, the circumstances surrounding this case I
20    describe as rather unique.  It was a confluence of things
21    that came into place.
22             I was approached to provide financing for this
23    enterprise and it was headed by an individual of immense
24    stature in terms of the Gambian military who had extensive
25    contacts not only within the ranks of the armed forces, but
```

1     also within certain circles in the U.S. military.

2          I was convinced that this is an enterprise that

3     the government supported.  That was based on my own

4     understanding of the nature of the relationship as well as

5     the conversations that were relayed to me by Sxxxxx, whom I

6     had a lot of respect in.  That is why I signed up for it.

7          It also came as a culmination of 20 years of

8     working to try and bring about peaceful change in

9     The Gambia.  I had been a part of that in providing

10    financial resources for various groups, including opposition

11    parties, to work within the system to bring about change.

12         And I regret my part in the fact that we broke

13    U.S. law in our zeal to change the government of The Gambia.

14    That was wrong, we shouldn't have done it, but I felt

15    obligated to help my country, my native country.  I believed

16    that what we did was supported by the U.S. government, would

17    have advanced U.S. interests and the interests of justice.

18    And we won't do it again.  I think it's become apparent that

19    the U.S. government didn't support the enterprise, but that

20    is after the fact.

21         And I believe that these things -- it's an

22    evolutionary process.  Just like the Arab Spring happened in

23    Egypt and other countries, we have seen a flowering of this

24    same boldness among Gambians to stand up for their rights

25    and eventually it is Gambians on the ground who will have to

1   spearhead this effort to change their own lot.  We're here

2   as former -- as native Gambians to help in that process, but

3   the task really remains for the Gambian people.

4          MR. BIRRELL:  Thank you, Your Honor.  I don't have

5   any other questions.

6          THE COURT:  Counsel.

7          MR. KOVATS:  Thank you, Your Honor.

8                       **CROSS EXAMINATION**

9   BY MR. KOVATS:

10  Q.  Good morning.

11  A.  Good morning.

12  Q.  So I want to just ask you a couple of questions about

13  your belief that the attempted coup was supported by the

14  United States government.  First I wanted to talk to you a

15  little bit about your background, though, and your work as a

16  successful businessman.

17  A.  That is correct.

18  Q.  And in order to grow a business, oftentimes you need to

19  interact with other businesses; is that right?

20  A.  Yes.

21         THE COURT:  Counsel, could you keep your voice up

22  or get a little closer.

23         MR. KOVATS:  Yes, Your Honor.

24         THE COURT:  It's a large courtroom and there are

25  people in the back who I think probably are having some

1          trouble hearing you.

2                    MR. KOVATS:  Yes, Your Honor.

3                    THE COURT:  Thank you.

4     BY MR. KOVATS:

5     Q.  Would you agree with the general proposition when you're

6     dealing with another business that you want to deal with

7     someone who is a decision-maker; is that right?

8     A.  That is correct.

9     Q.  And you don't want to attempt to make a bargain with a

10    potential business partner when you're not speaking with the

11    people who have the ability to bind that organization; is

12    that right?

13    A.  Generally that is correct, yes.

14    Q.  And so here what I'm questioning is your reliance on the

15    presence of a single enlisted soldier in the United States

16    military that caused you to think that the military was now

17    behind your effort.  Would you agree with me that the Army

18    includes on active service more than 500,000 soldiers?

19    A.  I do agree, but it was hardly that lone soldier alone on

20    which my decision was based.

21    Q.  And would you agree with me that this single soldier

22    concealed from his command his role in this coup from the

23    beginning?

24    A.  Well, I don't know what the single soldier concealed or

25    not.

1    Q.  And when Lxxxx Sxxxxx left the United States to go

2    travel to the coup, you testified that he concealed from the

3    FBI the true intent of his travel; isn't that right?

4    A.  Well, he said he told them he was going to visit his

5    son.

6    Q.  So maybe that particular statement was true, but it

7    wasn't an honest description of the full measure of his

8    travel; isn't that right?

9    A.  I actually don't know whether he visited his son or not

10   in Dakar.  He could do both, I suppose.

11   Q.  Right.  But when asked if he was going abroad to

12   participate in a coup, he said no and that was false?

13   A.  No, what he reported to me was he told them his mission

14   was to go and visit his son.

15   Q.  As he was leaving the United States to participate in a

16   coup?

17   A.  That is correct.

18   Q.  This is a picture we've seen on the video and this

19   particular one comes out of exhibits filed by the defense

20   here.  This is August of 2014 and it's a picture of,

21   obviously, the president of the United States with the

22   president of The Gambia.

23          And this would suggest, in fact, that the United

24   States, more so than the reports from a single soldier in

25   Germany, was not going to endorse the violent overthrow of

1    The Gambia; would you agree with that conclusion?

2    A.  I don't think I can base my conclusion on this picture.

3    Q.  Is it fair to say that you wanted to believe that your

4    effort was supported by the United States government even if

5    the evidence didn't support that belief?

6    A.  No, I don't think so.  My thinking was that, in fact,

7    the U.S. government was supportive.  I mean, just looking at

8    the -- you're presenting a picture there.  One of our

9    colleagues met with the State Department, for example, in

10   December of 2014, Banka Manneh, that is, in which Gambia was

11   discussed.  The human rights record of The Gambia became a

12   topic for that and about that time the spokesperson of the

13   National Security Council, a lady by the name of Bxxxxxxxxx

14   Mxxxxx, came out with a strong statement of condemnation of

15   Jammeh's human rights records.  So in totality you can see

16   that the reasonable conclusion is that nobody will shed a

17   tear if Jammeh were overthrown.

18   Q.  And why, then, was there the need to do the planning and

19   the resourcing all in private amongst yourselves if it was

20   something that you felt was well-supported by the United

21   States government?

22   A.  Well, this was an initiative that the Gambians were

23   doing on their own and the signal was that this was

24   supported, and I had no reason to think otherwise.

25   Q.  And so the signal is a conversation that one member of

1    the conspiracy had with a lieutenant colonel in the armed

2    forces who served as an attaché and your conversation with a

3    sergeant in Germany who was serving with the armed forces?

4    A.  For example, when I discussed it with Sxxxxx, his

5    encounter with the FBI, one of the things that came about

6    was while they interviewed him he told them what he was

7    going to do in Senegal.

8    Q.  When they interviewed him he lied about the true purpose

9    of his travel?

10   A.  What he said was, They didn't arrest me, did they?

11   Q.  Because he said he was going to do something that was

12   lawful rather than to describe something unlawful?

13   A.  So I'm just telling you my own frame of mind at the

14   time.

15   Q.  Thank you.

16   A.  Thank you.

17          MR. BIRRELL:  No further questions.

18          THE COURT:  Okay.  Thank you.  Sir, you may step

19   down.  Thank you.

20          THE WITNESS:  Thank you.

21          THE COURT:  Mr. Mohring.

22          MR. MOHRING:  Your Honor, the defense now calls

23   Papa Faal.

24          THE COURT:  We'll start by swearing you in, so if

25   you would stop and raise your right hand, sir.

1          (Witness sworn)

2              THE COURT:  If you would take the witness chair,

3     please.  We'll start your testimony by having you give us

4     your full name and if you would please spell your last name.

5              THE WITNESS:  My name is Papa Faal.  Last name

6     spelled F-a-a-l.

7              THE COURT:  Counsel, you may proceed.

8                        **(Papa Faal)**

9                    **DIRECT EXAMINATION**

10    BY MR. MOHRING:

11    Q.  Mr. Faal, if you could pull the microphone to you and

12    try to speak into it.

13              You testify this morning as one of the four people

14    who stand convicted by guilty plea of violating the

15    Neutrality Act?

16    A.  Yes.

17    Q.  I want to just ask you some questions first about your

18    background before asking you to talk about your knowledge of

19    peaceful efforts to try to generate positive change in

20    The Gambia.

21              So if you would tell us, please, when and where

22    were you born?

23    A.  I was born in The Gambia 1968.

24    Q.  And did there come a time when you emigrated to the

25    United States?

1    A.  I emigrated to the United States in 1991.

2    Q.  So you came to the United States a man of how old?

3    A.  I was, I think, 22 or 23.  I've got to do the math.

4    Q.  Okay.  And as you testify here today, what is your

5    immigration or legal status in the United States?

6    A.  I'm a U.S. citizen.

7    Q.  When did you become a citizen?

8    A.  I became a citizen in 2005.

9    Q.  You have family here in the United States?

10   A.  Yes, I do.

11   Q.  Can you tell us who.

12   ███ ████████████████████████████████████████████

13   ██████████████

14   ███ ██████████████████████████████

15   ███ ████████████████████████████████████████████████

16   ██████████████████████████████████████████████████

17   ██████████████████████████████████████████████████

18   ████████████████████████

19   ███ ████████████████████████████████████████████

20   ███ ██████████████████████████

21   Q.  And how long have you lived in Minnesota?

22   A.  Since 2002.

23   Q.  I want to ask you just a few questions about your

24   education.  How far did you go in school in The Gambia?

25   A.  I graduated from high school in The Gambia.

1    Q.  Completed secondary education?

2    A.  High school, yes.

3    Q.  And then did you continue your education when you came

4    to the United States?

5    A.  Yes, I did.

6    Q.  Can you tell us about what you studied and what degrees

7    you have.

8    A.  I studied at Strayer University in Washington, D.C.

9    Q.  That's Strayer?

10   A.  Strayer.  That is S-t-r-a-y-e-r.  It's a private

11   university.  I started with the University of District of

12   Columbia and then I moved to Strayer University.  That was

13   in 1994.  I graduated in 1999 with a computer science

14   degree.

15   Q.  And would that be a bachelor's level?

16   A.  A bachelor's degree in computer science.

17   Q.  Did you continue your education after that?

18   A.  I continued my education at the University of Maryland

19   and I completed that in 2007 and 2008 consecutively with a

20   master's in technology management and a master's in business

21   administration.

22   Q.  And are you studying now?

23   A.  I am studying.  I'm pursuing my doctorate degree in

24   business administration at Walden University.

25   Q.  So your education focused, among other things, on

1    computers and computer systems?

2    A.  Mostly systems, computer systems, but combined with

3    business, technology in business world.

4    Q.  And were you employed -- have you been employed in the

5    area of your study?

6    A.  I have.  Since 1998 I was working as a system engineer

7    or network engineer.  I have several certifications as a

8    network engineer.

9    Q.  We've been talking about you as a student.  Have you

10   also taught?

11   A.  I taught at -- what is it again?  I taught at a

12   university and a college, Howard University in Washington,

13   D.C. and then I taught here too.  I taught computers and

14   business school classes.

15   Q.  And so you mentioned that you've been employed in your

16   area of study.  Are you working now?

17   A.  I am a taxi driver.

18   Q.  And is that because of conditions that have been a part

19   of your supervision?

20   A.  Yes.  I couldn't work in my field of study because of

21   conditions.

22   Q.  Okay.  So we've talked about education.  We've talked

23   some about employment.  Have you been engaged as a United

24   States citizen in the United States in public or military

25   service?

1    A.  I served in the military for ten years.

2    Q.  In which branches?

3    A.  I served in the Air Force for seven years and then I

4    moved to the Army for commissioning.  I spent three years

5    there.

6    Q.  And what's your status as far as the military is

7    concerned now?

8    A.  I left the military in 2002 honorably discharged, end

9    term of service.

10   Q.  And in your service for the United States Army, where

11   did you serve?

12   A.  I was posted in various locations:  In McGuire Air Force

13   Base and then Andrews Air Force base in Washington, D.C. and

14   then I went to training in Georgia, Fort Benning, for a

15   little bit and then I went to Kentucky, that's where I did

16   my last tour, and I was deployed in Afghanistan.

17   Q.  So you did a tour in Afghanistan?

18   A.  Yes.

19   Q.  You are a combat veteran?

20   A.  Yes.

21   Q.  Have you received any commendations or awards for your

22   military service from the military?

23   A.  I did receive several commendations, I think about four

24   or five of them.  I had the ISAF medal also from going

25   overseas in Afghanistan and then a combat badge, action

1   badge.

2   Q.  Okay.  And have you received medical treatment since

3   coming back from Afghanistan through the Veterans

4   Administration?

5   A.  Yes.  I do receive all my veteran treatments over there,

6   treatment for PTSD, anxiety and PTSD.

7   Q.  And you have seen the presentence investigation report

8   that the Probation Office prepared as a part of this case?

9   A.  Yes.

10  Q.  Does that report accurately summarize the treatment that

11  you've received?

12  A.  Yes.

13  Q.  Does it also accurately summarize the awards and

14  commendations that you have received for your service to the

15  United States of America?

16  A.  Yes.

17  Q.  Okay.  I want to ask you some questions about your

18  knowledge of efforts to bring about change peacefully in

19  The Gambia and I want to ask about a couple of different

20  areas of activity.

21        You've been here in court all morning?

22  A.  Yes.

23  Q.  And so you have seen the video, but also you understand

24  that the coup that brought Yahya Jammeh to power happened in

25  1994?

1    A.  Yes.

2    Q.  Can you tell us, what type of government did that coup

3    overturn?

4    A.  It was a democratically-elected government, peaceful and

5    respect human rights and rule of law.

6    Q.  The video that we all watched together this morning

7    mentioned several organizations that have been working in

8    the Gambian diaspora in the communities outside of

9    The Gambia itself to bring about change.  Can you tell us,

10   please, the names of organizations that you're familiar with

11   that were active in that way.

12   A.  There are many of them.  Of course we have been in this

13   fight for a long time.  For over 22 years we've been

14   fighting to try to get -- expose the plights of the Gambian

15   people to the international community.  So we have several

16   efforts: ███████████████████████████████,

17   which was a brainchild from our unprecedented conference in

18   Raleigh, North Carolina, to try to bring all the Gambian

19   organizations and their diaspora together so we can have one

20   mission.

21   Q.  So let's talk about that.  You said there was a

22   conference trying to bring everybody together in Raleigh,

23   North Carolina?

24   A.  Yes.

25   Q.  When did that conference happen?

```
 1     A.   That was in 2013.

 2     Q.   And did you attend and participate?

 3     A.   I did attend that conference.

 4     Q.   And out of that I think you used an acronym, but was it

 5     ████████████████████████████████████████████████

 6     ████████████████ --

 7     A.   Yes.

 8     Q.   -- that emerged from that?

 9     A.   Yes, sir.

10     Q.   And was the function or at least part of the idea behind

11     that committee to be an umbrella organization to coordinate

12     efforts?

13     A.   To coordinate efforts between the organizations because

14     we have organizations in all parts of the world.  We have

15     organizations in Great Britain, France.  So CXXXXX brings

16     all those together to coordinate processes.

17     Q.   And CXXXXX is C-X-X-X-X-X?

18     A.   Yes.

19     Q.   Among the organizations that were being coordinated, is

20     one ████████████████████████████████████████████████████████

21     ████████████████████?

22     A.   Yes, that's the one that is in the U.K.

23     Q.   And do you know how long that organization has been --

24     A.   That's been around, I think, in the '90s as well.

25     Q.   Is ███████████████████████████ another of these
```

1    organizations?

2    A.  Yes.

3    Q.  I think you mentioned ███████████████████████?

4    A.  Yeah.

5    Q.  Is ████████████████ another one of the

6    organizations?

7    A.  That's another one also.  Its mission is to raise funds,

8    centralize fund-raising activities so we can have a single

9    source of revenue where the revenue can be disseminated to

10   other organizations and functions that are promoting the

11   efforts for a peaceful change in The Gambia.

12   Q.  And among -- so still talking now about ████████████

13   █████████████, was some of the money that was generated and

14   raised by ████████████████████ used to fund opposition

15   candidates in The Gambia?

16   A.  Yes.  Not in particular individually, but the money is

17   given to them for their processes in terms of campaign, you

18   know, and grassroot activities.

19   Q.  Okay.  You've talked about some of the objectives of

20   these organizations, but I'm wondering if you could just

21   tell us, what were these organizations trying to accomplish?

22   A.  Well, as I said before, our struggles have been long and

23   tedious.  We have several organizations, individuals that

24   have participated very long and have passion for change and

25   to bring about peace and some hope for the people of

1    The Gambia, our people in The Gambia.

2         And the functions of this organization is to

3    engage the international community.  We have met with

4    several, several communities.  The EU, the European Union,

5    Dr. Janneh has been leading that.  He met with several,

6    several key leaders and that's why the EU was able to

7    produce some of those requirements for Jammeh and hold on to

8    funds to make sure that, you know, democracy and human

9    rights return to The Gambia.  The Commonwealth, the ECOWAS,

10   the United States here, we did a lot of protest, a lot of

11   protest here and coordinated protests in Europe, both Europe

12   and here over the years.  We have met with state

13   representatives.  We met with the State Department numerous

14   times.  So all these organizations.

15         Letter-writing, we wrote several letters and

16   packages that we delivered to these lawmakers, all to bring

17   about a sense of exposure and seeking help for the -- to

18   ease the plights of the people of The Gambia.

19   Q.  You mentioned interaction with elected representatives

20   of the United States government.  Let me ask you a few more

21   questions about that.

22   A.  Yes.

23   Q.  So did you and others involved in these committees meet

24   with representatives and senators?

25   A.  Yes.

1    Q.  As best as you can remember, can you tell us the names

2    of some of the people that you worked with.

3    A.  Here we met with Keith Ellison.  We sat down and talked

4    to him about -- this was when the nine prisoners were

5    executed and Baba Leigh was held, and we pushed efforts to

6    highlight that these people -- for them to condemn the

7    execution and at the same time to release the prisoners who

8    have done nothing.

9         We have also given him a package.  The package

10   contains a list of atrocities and the things that we would

11   like the United States to do, that is, to, one, execute a

12   travel ban for Jammeh and his people, his entourage, because

13   they frequent the United States and they loot the state's

14   funds to come down and spend it.  So a travel ban was one of

15   the key things that we have been asking and at the same time

16   we want the United States to at least push for a change.

17        We met with Senator Klobuchar's office.  We met

18   with Senator Al Franken and Betty McCollum's office here and

19   Senator Paulsen.  In D.C. we met with Mark Meadows and Luke

20   Messer.  And we had a long conversation also with the State

21   Department, Stephen Schwartz and his team, and we lay down

22   the conditions and the atrocities.  That was fairly recent.

23        In fact, when we went to meet the State Department

24   we brought along a young lady whose father had disappeared

25   for a long time and she did not know where the father was,

1  so we brought her along so we can have Stephen -- at least

2  seek the United States to help the young lady to find -- at

3  least have a sense of where her father was.

4  Q.  So we talked some about the Gambian organizations.

5  We've been talking about efforts to engage the legislative

6  branch through representatives in the United States.

7        Over what period -- and you said that the activity

8  of the organizations began in the '90s.  Over what period of

9  time did you and others try to engage the United States

10  through its elected officials, what's the time frame?

11  A.  I think it has been through that period of time because

12  I do remember in.

13        1997 we did, when the post president came here,

14  have a meeting with State Department to at least have a

15  conversation to say, you know, we don't want to go back to

16  power, but everything that we have worked for, the

17  democracy, the human rights, the rule of law that we have

18  worked for for all these -- for over 30 years, we watch

19  going down the drain.  So the request is to help -- for the

20  United States to at least help restore those values back

21  into power.  So as you can see, we've been pushing this in

22  1997 and in 2000 and then in 1998 and in various times.  So

23  it's fairly numerous, yeah, until now.

24  Q.  You mentioned the State Department, the executive

25  branch.

```
1    A.  Yes.

2    Q.  Was interaction and trying to engage the State

3    Department also a part --

4    A.  Yes.

5    Q.  -- of the activities?

6    A.  Yes.

7    Q.  Again, what kind of time frame did people work with the

8    State Department?

9    A.  It has been numerous times.  As I mentioned before, in

10   1997.  And Banka, one of the defendants, have been going to

11   the State Department for a long time.  I've been kept

12   abreast.  I have known the efforts that he and his team have

13   led at the State Department.  They're countless.

14   Q.  We've been talking about branches of the American

15   government, the United States government.  Were efforts made

16   to engage foreign governments in a similar fashion?

17   A.  Yes.  As I said, Dr. Jxxxxx, in addition to the former

18   vice president, Bxxxxx Dxxx, and --

19   Q.  I'm sorry.  Can you spell the last name.

20   A.  The last name is Dxxx.  D-x-x-x is how he spells his

21   name.  And Jxxxx Bxxxxx.  Bxxxxx is spelled B-x-x-x-x-x,

22   that's how it is spelled.  He's a lawyer in England.

23   They've been lobbying the European Union as well as the

24   English -- Great Britain's parliament.  They've been

25   lobbying there for a long time too.
```

1    Q.  Have efforts been made to engage NGOs, nonprofit

2    organizations as well?

3    A.  Yes.  There has been -- again, this team has worked

4    really hard to engage the United Nations.  The Human Rights

5    Watch, we have dealt with them numerous times also.

6    Recently when the vice president that I talked about or

7    spoke about, along with the political party leader, Oxxx

8    Jxxxxx -- his last name is J-x-x-x-x-x  -- came here, they

9    met with the United Nations in New York.  That was

10   facilitated by Sxxx Mxxxxx.  He is here.  And they came down

11   to here, Washington D.C.  We met over there and we met with

12   the National Endowment for Democracy and the National

13   Democratic Institute.

14   Q.  Is Amnesty International also among --

15   A.  Amnesty International was amongst those that we dealt

16   with as well.

17   Q.  You mentioned the United Nations and efforts to work

18   through the United Nations.  Was the International Criminal

19   Court a part of those --

20   A.  ICC was one of the efforts that was led by, again,

21   Dr. Jxxxxx and Mxx Fxxxx.  That's one of the guys

22   representing The Gambia.  They filed a lawsuit against

23   Jammeh for the atrocities in The Gambia, requesting that he

24   needs to be brought and charged with crimes of humanity.

25   Q.  You mentioned the conference in Raleigh.  We saw

1    evidence on the video of demonstrations and rallies in the

2    United States.

3    A.  Yes.

4    Q.  Over what period of time were public demonstrations a

5    part of the activities that you --

6    A.  The demonstrations have been really a part of our

7    efforts also.  DUGA, led by Px Sxxxx Jxx here, have been at

8    the forefront of organizing demonstrations around the

9    country, along with the international Gambians in the

10   international -- abroad also, because we usually do

11   simultaneous demonstrations.  When some of this is done

12   here, some is done in Great Britain and France and around

13   the world, all to make the world pay attention to the

14   plights of the Gambian people.

15   Q.  You mentioned also efforts to influence the Gambian

16   political process from within.

17   A.  Yes.

18   Q.  Let me show you, Mr. Faal, what's been marked as

19   Defendants' Exhibit 2 and ask if that's a document that

20   you're familiar with that you helped prepare.

21   A.  Yes.

22   Q.  And this is a document that summarizes things that we've

23   been talking about, efforts on the part of the Gambian

24   diaspora to improve conditions in The Gambia after the 1994

25   coup?

1   A.  Yes.

2   Q.  Based on your review of this document, does it

3   accurately present the information that it contains?

4   A.  In summary, yes.

5           MR. MOHRING:  I would move the admission of

6   Defendants' Exhibit 2, Your Honor.  Copies have been

7   provided to the Court and to counsel already.

8           MR. KOVATS:  No objection, Your Honor.

9           THE COURT:  Received.  Any objection from

10  co-defendants?  I assume not.

11          MR. BIRRELL:  No, Your Honor.

12          THE COURT:  Exhibit 2 will be received.

13  BY MR. MOHRING:

14  Q.  Mr. Faal, events in The Gambia continue as recently as

15  appearing -- as recently as today's newspaper.  Is it fair

16  to say that things have not gotten better; is that --

17  A.  They have not gotten better.

18  Q.  You've been charged as a defendant.  The proceedings

19  that we're having today and tomorrow relate to your

20  sentencing and the sentencing of these other men, you

21  understand that?

22  A.  Yes, I do.

23  Q.  At some point -- and this is a case that for you began

24  in early January of 2015, right?

25  A.  Yes.

1    Q.  At some point this will be over.  What are your plans --

2    you've been involved in peaceful efforts before.  What are

3    your plans for the future as far as working to improve

4    conditions in The Gambia?

5    A.  Well, like I said before, our struggle has been long and

6    tedious and very tough.  We as a community have done so

7    much.  Along with the defendants, they have -- we all have

8    done so much, from Banka being involved in activity, from

9    Alagie being involved in fund-raising and creating some

10   organizations for the fundings, from all the other people

11   that I have named here, we have been pounding the pavement

12   for over 22 years now.  We have not left any stone unturned

13   and we have knocked on every door for organizations to

14   listen, for the international community to listen.

15        Our activity, our event -- our involvement in the

16   event of December 2014 has been somewhat, we feel, as the

17   last resort, that there is no other options because we have

18   explored -- so we thought, that we have explored everything,

19   as the evidence will show.

20        But the price of December 30th have been really

21   tremendous both emotionally and physically on us and our

22   families.  Emotionally there has never been a day -- we lost

23   very, very close friends.  Nxxxx and Lxxxx and Axxxxxx have

24   been almost brothers to us.  Gambia is a very small

25   community.  It seems everybody knows everybody else.

1    So the impact of our actions have been both in

2    The Gambia and it has been -- our families have gone through

3    so much uncertainty because day in and day out they are

4    probably wondering when they're going to be picked up.  We

5    the same thing because we do have our families back there.

6    We don't know whether they are going to be picked up when we

7    woke up the next day.

8    ████████████████████████████████████████████

9    ██████████████████████████████████████████████████

10   ████████████████████████████████ Just thinking about that

11   has been so tremendously impactful and hurtful, just

12   thinking what they have been going through.

13   Yahya Jammeh does not pick -- the government does

14   not just pick somebody and put you in a prison that has all

15   the amenities that we have here.  It's a rathole.  Just

16   thinking about those people, the families of those people

17   inside of that rathole is a psychological blow and a trauma

18   for them.

19   Thinking every day -- as I say, Nxxxx Jxxxx has

20   been a brother to us.  Lxxxx Sxxxxx the same thing.  There

21   has never been a day that I have not thought about them,

22   that there has never been a day that I wish the consequences

23   that had done -- that led to his unfortunate demise had not

24   happened.  If we had actually foresaw the consequences of

25   our actions, we would not have taken that endeavor because

1  we have done so much.

2          And I'm hopeful that we will continue to work

3  diplomatically because we know that forceful takeovers of

4  governments and forceful means through change has

5  consequences and deadly consequences not only for the people

6  who actually die, but their families.

7          And I see Nxxxx's mother and I can barely look at

8  her because she never stopped crying because, one, she

9  didn't have the body of Nxxxx to close that -- to have a

10  closure because Yahya Jammeh did not give them that body.

11  Nobody knows what he did to them.  That hurts.  That hurts a

12  great deal.  And Nxxxx being a war veteran, having no sense

13  of where he is right now day to day hurts a great deal.

14          It is not an option that I will recommend moving

15  forward for any of our organizations, for anybody for that

16  matter, because the consequences will live on for the rest

17  of our lives.

18          And we realize that we have other options.  We've

19  been doing it for a long time.  The road has been rough and

20  it will continue to be rough.  As they say, Rome was not

21  built in one day.

22          So our liberties in The Gambia -- the Gambian

23  people's liberty will be achieved one day, but not through

24  forceful means.  That's what I am aspiring to, that we can

25  continue to fight our fight peacefully like we have been

```
 1     doing, that is, going to the international organizations,

 2     engaging everybody until we achieve what we want to achieve

 3     in The Gambia.

 4     Q.  Thank you, Mr. Faal.

 5             MR. MOHRING:  I have no further questions at this

 6     point.

 7             THE COURT:  Thank you, sir.  You may step down.

 8             MR. MOHRING:  I think --

 9             THE COURT:  Oh, I'm sorry.

10             MR. KOVATS:  Thank you, Your Honor.

11             THE COURT:  I forgot the government.  I apologize.

12     Proceed.

13             MR. KOVATS:  No, I don't, Your Honor.

14             THE COURT:  Oh, you don't.

15             MR. KOVATS:  I wasn't just following your lead.  I

16     didn't even before you were going to excuse the witness.

17             Thank you for your testimony.

18             THE COURT:  You may step down, sir.

19             THE WITNESS:  Thank you.

20             THE COURT:  Mr. Mohring.

21             MR. MOHRING:  Your Honor, it's my understanding --

22     we have no other testimony to present.  We would propose and

23     ask to be able to address the Court about legal issues of

24     common concern, to be able to discuss those once as they

25     apply to everybody, in anticipation of individual
```

1    sentencings coming after that.

2              THE COURT:  Do you want to do it right now?

3              MR. MOHRING:  Sure.  If I could have just a

4    moment?

5        (Pause)

6              MR. RICHMAN:  Your Honor, could we approach for a

7    moment?

8              THE COURT:  Certainly.  Do you want it on the

9    record?

10             MR. RICHMAN:  No.

11       (Discussion off the record at sidebar between

12        the Court and counsel)

13       (Pause)

14             MR. MOHRING:  Are you ready, Judge?

15             THE COURT:  Mr. Mohring.

16             MR. MOHRING:  Thank you, Your Honor.  Your Honor,

17   I want to touch briefly on the ways in which, from the

18   common defense view, the sentencing guidelines just fail to

19   do justice to the circumstances and the facts of this case,

20   this offense and the events that surround it.

21             Section 5K2.0 is what I am going to be talking

22   about.  That section of the sentencing guidelines allows,

23   indeed calls for a departure to the extent that the case

24   presents, and I quote, circumstances of a kind not

25   adequately taken into consideration.

1          THE COURT:  That's 5K2 --

2          MR. MOHRING:  5K2.0, Your Honor.  It's actually

3    one of the sections in the guidelines that appears entirely

4    capitalized, at least that discussion.  I think we would

5    have noticed it otherwise.

6          From our view, Your Honor, this case presents four

7    separate considerations about which the facts are not in any

8    dispute that the guidelines simply don't touch.  Those four

9    considerations can be seen as spectrums on which each of

10   these men fall on the far mitigating edge and so from that

11   standpoint there are four separate bases for 5K2.0

12   departures in this case.

13         Your Honor, I won't review the facts.  The Court

14   has seen the video.  The Court has seen the testimony of

15   these gentlemen.  Significant joint submissions that touch

16   on these matters have been presented to the Court.  The

17   human rights abuses of this regime are well-documented and

18   undisputed.

19         The language of "nations friendly to the United

20   States," nations who are our friends, appears in the

21   Neutrality Act and "friends" is defined as anybody against

22   whom we have not declared war.  And we as a nation have not

23   declared war against anybody since World War II.  We have a

24   wide spectrum of friends, then, if you will.

25         That spectrum runs from governments that are

1    positive and constructive and respectful of human rights to

2    governments that are not, to governments that are at the

3    extreme end, on the other side from Sweden, if you will, to

4    Saddam Hussein's Iraq.

5         And the location of the circumstances in this or

6    any case under the Neutrality Act on that spectrum, from our

7    view and from the guidelines view, should be relevant to

8    sentencing.

9         The need for punishment, the need for deterrence,

10   the enormity of the crime itself increases with the decency

11   of the regime.  We submit that an effort to overthrow the

12   government in Sweden would be viewed in very different

13   light, and should be, by a court looking through the lens of

14   the Neutrality Act than an effort to change a regime such as

15   was present in Iraq or such as is present in The Gambia.

16        That is a spectrum for which each of these four

17   men come on the far mitigating side.  That is a spectrum

18   that is in no way addressed by the sentencing guidelines and

19   so this alone is a basis for mitigation, for a downward

20   departure from the sentences -- from the ranges suggested by

21   the guidelines.

22        A second consideration, a second 5K2.0

23   consideration, is the effectiveness or ineffectiveness of

24   the international community.  Again, the Court can imagine a

25   spectrum from a situation where international peaceful

1    efforts are working to a situation where they are not.

2          The offense of violating the Neutrality Act would

3    be of greater concern, it would be a more serious crime, it

4    would be a crime more deserving of punishment and deterrence

5    where people acted as these men did under circumstances

6    where positive change was already happening.

7          But clearly and demonstrably and emphatically it

8    was not and so this is a second spectrum in no way

9    considered by the sentencing guidelines on which each of

10   these men fall at the far mitigating end, a second basis for

11   a 5K2.0 departure.

12         A third variable, a third spectrum is the extent

13   to which the actions of the individuals who now stand before

14   the Court convicted of violating the Neutrality Act in which

15   their actions were either consistent or inconsistent with

16   declared foreign policy of the United States of America.

17         A more serious crime is committed by people who

18   fly in the face of American foreign policy and who are

19   brought before a court, before a court such as this, than by

20   individuals who act in ways that are consistent with the

21   declared statements and interests of the American foreign

22   policy establishment.

23         And the Court has heard some of this.  The

24   Neutrality Act from the government's view has as a purpose

25   restricting private exercise of foreign policy or private

1     involvement in foreign policy.  But the Neutrality Act

2     exists especially to restrict actions by individuals acting

3     in the foreign policy arena that are inconsistent with

4     declared policies of the United States of America.

5          I talked about the Neutrality Act.  The Neutrality

6     Act defines as friends -- at least as it has been

7     interpreted by the court, our friends are anybody against

8     whom we have not declared war.

9          Very clearly the Jammeh regime and Jammeh himself

10    has declared war on the United States.  He has said, "For

11    Muslims" -- "Promoting homosexuality and imposing it on

12    weaker or poorer nations is a declaration of war on both

13    religions and human existence.  For Muslims this is a

14    declaration of war on Islam, a declaration of war against

15    Allah, a declaration of war on human existence for which

16    every true believer must be ready to lay down your life to

17    defend Islam, fighting the cause of Allah and defend human

18    existence."  That's what he thinks of us.

19         In terms of what we think, there have been

20    responses, many responses, press releases, declarations from

21    the State Department.  In response to those comments the

22    Secretary of State said, "We call on the government of

23    The Gambia to protect the human rights of all Gambians and

24    encourage the international community to send a clear signal

25    that statements of this nature have no place in the public

1       dialogue and are unacceptable."

2              More recently in 2013 President Obama made a

3       proclamation on the occasion of Human Rights Day and Human

4       Rights Week and what he said is:  "It is our obligation as

5       free peoples to stand with courageous individuals who raise

6       their voices to demand universal rights.  Under extremely

7       difficult circumstances and often at grave personal risk,

8       brave human rights defenders and civil society activists

9       throughout the world are working to actualize the rights and

10      freedoms that are the birthright of all human kind.  The

11      United States will continue to support all those who

12      champion these fundamental principles and we will never stop

13      speaking out for the human rights of all individuals at home

14      and abroad.  It is a part of who we are as a people and what

15      we stand for as a nation."

16             He goes on to talk about his administration

17      supporting free and fair elections, opposing efforts by

18      foreign governments to restrict the freedoms of peaceful

19      assembly, association, and expression.

20             What these men did was entirely -- and the

21      objectives that they were pursuing -- was entirely

22      in harmony with these declarations of United States

23      officials.

24             Whether the actions were in opposition to or in

25      conformity with declarations of American foreign policy is a

1    third spectrum, a third variable, if you will, that the

2    sentencing guidelines in no way address or embrace or

3    consider.

4              There is no dispute about the facts that operate

5    in this condition and those facts put these four men, again,

6    at the far mitigating end of that spectrum.  This is a third

7    basis for a Section 5K2.0 departure.

8              The last variable within the 5K2.0 arena is the

9    altruism, if you will, of the defendants themselves.  You

10   can imagine a spectrum on which people are acting for their

11   own personal aggrandizement to seize power for their own

12   benefit on one end and people who are acting genuinely in a

13   spirit of improving the lives and the conditions of the

14   nation that they are trying to influence.  That is a

15   spectrum -- that is a fourth spectrum that the guidelines,

16   again, fail in any way to meaningfully consider or address.

17             That is a spectrum on which these men fall at the

18   far mitigating end.  As the Court has heard, their

19   objective, their sole objective was to facilitate a brief

20   transition to a democratic government.  It was an explicit

21   overt part of their plan that the interim head of state

22   would not and could not stand as a candidate for office in

23   those elections.  Their goal was to bring about positive

24   change, period, and not to benefit or aggrandize themselves.

25             These are four aspects of the case that the

1    guidelines don't consider.  The facts that support them are

2    uncontested.  The record of these facts is unambiguous.  And

3    because the defendants fall at the far mitigating end on

4    each of these, a downward departure from the guidelines

5    under Section 5K2.0 is supported by uncontested facts of the

6    case.

7                 THE COURT:  For the government.

8                 MR. KOVATS:  Just to speak briefly on the point

9    about a departure.

10                Certainly I think the general facts here aren't in

11   dispute.  The government accepts generally what Mr. Mohring

12   said on behalf of all counsel about the motives of the

13   individuals here.

14                Certainly the United States State Department has

15   spoken their views on the regime of The Gambia.  Certainly

16   counsel for the United States here is in no position to

17   expand or contract what the State Department has said.  It's

18   the province of the State Department to speak on behalf of

19   the United States and so I'm not going to go further than

20   what's been said.

21                I will say, though, I do have some disagreement

22   with counsel on his view of the notion that a friendly

23   nation is perhaps overbroad and it describes everybody

24   that's not at war and somehow that definition isn't fair.

25                And I think from the government's point of view,

1     the United States can't have people in this country

2     conspiring to tip over other countries.  They can't raise an

3     army, a private army here, to do private foreign policy on

4     behalf of their own motives no matter how noble.

5           And whether that is to be directed against Sweden

6     or whether that's to be directed against the regime of

7     Saddam Hussein or some other country that the United States

8     is at peace with but is probably considered a rival, it

9     doesn't matter, Your Honor, it's still not okay.

10          That might influence the judge's decision on a

11    sentence here, but I would submit to you that when a private

12    army is raised and sent abroad to do violence overseas, if

13    that were to happen in Sweden and the United States

14    responded to that coup attempt in the streets of Stockholm

15    in a responsible way, presumably the government of Sweden

16    would allow us to handle it and we would handle it.

17          If that same thing happened in a country with

18    which we're not as friendly or at peace, a Neutrality Act

19    violation would have occurred, that violence was unleashed

20    on the streets of a rival capitol, and we said we've got

21    this, they may say, no, you don't and they may respond in

22    ways that are very dangerous to the interests of the United

23    States.

24          And so I would submit here that the fact this is

25    The Gambia, it matters.  It matters as much as the Court

1    thinks it matters, perhaps to a point, but the fact that

2    it's a peaceful country or a country that may be a rival of

3    the United States doesn't diminish the government's interest

4    in making sure that it's handled and people are told this is

5    not okay, because it isn't.

6          The consequences of the act are unpredictable,

7    they're not foreseeable, and here, you know, we don't know

8    if they've even been fully felt by the United States as a

9    result of the conduct of these men.

10         So I would submit to the Court that a basis for

11   departure here that this is mitigating because it's The

12   Gambia and it would be aggregating if it was Sweden is a bit

13   dangerous calculus to play.

14         The other issue I'll take with what counsel has

15   stated was that this was consistent with foreign policy and

16   therefore a departure is warranted.  And I would concur that

17   the goals of these men as depicted in their sentencing

18   papers, a democratic regime in The Gambia that respected

19   human rights, is a goal that I believe the United States

20   would support here and everywhere else in the world.

21         The means, however, the means to achieve this goal

22   are absolutely inconsistent with foreign policy, Your Honor,

23   absolutely inconsistent with the government's foreign

24   policy.  And I think that's an important distinction.

25              And when the Court considers whether or not to

1     give a departure downward because what was done is

2     consistent with foreign policy, I think that would be in

3     error.

4            And so those are the two issues I have with what

5     defense counsel said.  And subject to your questions, I'll

6     leave it at that.

7            THE COURT:  That's fine.

8            Anything else from anybody on the defense side?

9            MR. MOHRING:  No, Your Honor, not on this point,

10    Your Honor.

11           THE COURT:  I'll take it under advisement.

12           What other points?  Are there any other issues?

13    Mr. Larsen.

14           MR. LARSEN:  Yes.  Thank you, Your Honor.  I just

15    have a couple of, I guess, less policy-oriented issues to

16    respectfully call to the Court's attention here.

17           In particular, if Your Honor is inclined, let's

18    say, not to grant our departure and go through an arithmetic

19    adding up of offense level points and the like under the

20    guidelines, we obviously have the presentence reports that

21    have been done and I'll be speaking specifically to my

22    client's concerns with a few of the determinations that have

23    been made within the report applicable to Defendant Banka

24    Manneh.

25           The Court heard, I think, a couple of times during

1      Defendant Papa Faal's testimony about Banka and I think the

2      Banka he was referring to was Mr. Manneh, who is sitting way

3      over to your right-hand side in the well area of the

4      courtroom.

5           There are a couple of guideline issues sort of

6      swirling beneath the surface of this case, again, less

7      policy oriented and perhaps more sort of working through

8      what the guidelines themselves actually say and the like.

9           And the first of them that I would like to call to

10     the Court's attention is the government's request here for a

11     four-level upward adjustment based upon Mr. Banka Manneh's

12     purported role in the offense.

13          Now, we've obviously briefed that issue to Your

14     Honor, I think, twice now and I'm not going to rehash all of

15     the cases that we've called to your attention and the actual

16     words of the guideline that we have called to your

17     attention, but there is one additional issue I was thinking

18     about this morning before driving down here to downtown

19     St. Paul and it was to go ahead and take a look at what the

20     statute actually says here.

21          And I think that is crucial to the Court's

22     analysis because the guideline, after all, speaks to the

23     court's assessment of a defendant's role in the offense and

24     that's the words of the guideline itself.  That's at 3B1.1.

25     Does it deserve no enhancement or does it deserve all the

1        way up to a four-level upward adjustment?

2                Well, what is the offense that we're talking about

3        here?  After all, the guidelines require us to examine the

4        role, quote, in the offense, end quote.  And here's what the

5        offense is.  It's a conspiracy to violate this statute and

6        it's set forth right in the indictment.  It's Title 18,

7        United States Code, Section 960.

8                And here's what Congress teaches us is an offense:

9        "Whoever takes part in any military or naval expedition or

10       enterprise to be carried on from therein," that is, from

11       inside the United States, "against the territory or dominion

12       of any foreign prince or state."

13               That's the offense that the guidelines say the

14       court is to assess when determining whether the role of a

15       player in the offense deserves a higher guideline offense

16       level calculation or a lower guideline offense level

17       calculation.

18               Here's why my client does not deserve a four-level

19       increase.  He is a prominent individual in the expatriated

20       Gambian community.  His name has been brought up here this

21       morning, even though we chose not to have him take the

22       stand, because one cannot have a discussion about what this

23       community means vis-a-vis the despotic ruler in west Africa

24       without running across Mr. Banka Manneh as a prominent

25       speaker in favor of justice, in favor of the rule of law, in

1      favor of democracy.

2              But that's not what the offense is here.  There's

3      no offense associated with this case that really has

4      anything to do with what Mr. Manneh's role of prominence is.

5      Mr. Manneh's role with respect to the offense, that is,

6      taking part in, quote, any military or naval expedition, end

7      quote, really was limited to assisting in purchasing

8      firearms, packing them up into oil barrels, and shipping

9      them overseas.

10             For goodness sake, as the presentence report

11     points out without objection from either party, he's never

12     had any military service at all.  He wouldn't have known

13     what to do to, quote, take part in any military or naval

14     expedition and that's why a four-level enhancement here

15     would be inappropriate.  His role in the offense is sort of

16     like plain vanilla.  It's like yogurt for breakfast in the

17     morning.  It doesn't really make a big statement.

18             His political activities?  A different assessment,

19     I would grant that.  That's obvious from the testimony that

20     you've heard.  That's obvious from Exhibit Number 2, which

21     has his name all over it with respect to activities to set

22     things right peacefully in the Gambia.

23             But a four-level role enhancement would be

24     inappropriate on these facts because his role in the

25     offense is not an aggregated role.  It's a neutral role

1    really.

2              There's another guideline issue I'd like to call

3    to the Court's attention and that has to do with the

4    four-level upward adjustment based upon the discovery in

5    The Gambia I think by the FBI on the very day we last were

6    before the Court on May the 5th of last year to enter guilty

7    pleas before the Court.

8              This four-level role enhancement for obliterated

9    serial numbers, what's most telling about its

10   inapplicability to my client, Mr. Manneh, is that as the

11   government honorably has brought forth both to Probation and

12   to Your Honor, none of the eight firearms my client was

13   associated with were found to have an obliterated serial

14   number, not even by the FBI.

15             And putting to one side who actually did

16   obliterate the serial numbers on the ground in The Gambia,

17   for all we know it could have been Gambian law enforcement

18   actors that were actually involved with that.  We just don't

19   know who did it.

20             But what we do know is with respect to the eight

21   firearms Mr. Manneh is associated with, based upon what the

22   plea agreement says regarding those eight firearms really,

23   none of them bore obliterated serial numbers and that's why

24   that four-level role enhancement would be inappropriate

25   based upon these facts.

1          And, again, just one last point.  Stepping away

2     from the policy and sort of getting into some of the minutia

3     of what the guidelines require the court to look at in

4     coming up with an appropriate guideline calculation concerns

5     the number of firearms here.

6          I think the presentence report, if I remember

7     correctly, Your Honor, speaks to, I think, some 26 firearms

8     having been found on the ground in The Gambia.  My client

9     was associated with eight of those.

10          We're more than willing to stipulate to the

11     four-level role -- I'm sorry, the four-level upward

12     adjustment that the eight firearms should bring about, but

13     coming to the conclusion that my client's relevant conduct

14     extends to 26 firearms, I just don't see where in the

15     evidence that conclusion can be supported.

16          So a four-level role adjustment -- I'm sorry, a

17     four-level upward adjustment given the number of firearms is

18     entirely appropriate based upon the stipulations in the plea

19     agreement, but the additional two levels that the probation

20     officer has recommended here we do respectfully object to.

21          So that's sort of some of the minutia involving

22     the case.  I'm sorry to have to drag us all through it, but

23     some of this is numbers and I respect the Court's

24     obligations in that regard.  We wanted to at least get our

25     position as a matter of record before Your Honor.

1          There are additional guideline issues I would like

2     to call to your attention that now come closer to what

3     Mr. Mohring was speaking about earlier when he addressed

4     Guideline Section 5K2.0.

5          And I would like to call these to your attention,

6     Your Honor, because I think in the aggregate they all

7     counsel exactly the same type of relief that Mr. Mohring is

8     seeking, that is, a substantial departure based upon what

9     largely amounts to a record of undisputed evidence that

10    you've heard this morning.

11         Now, the first of those guideline sections, Judge,

12    is 5K2.10 and that one is captioned Victim's Conduct and it

13    speaks to the question about whether the conduct of a victim

14    can provoke the offense such that the culpability of the

15    defendant should be concluded to be less as opposed to more.

16         And we know what the victim is in this case

17    because, again, it's not disputed.  It's right -- at least

18    in Mr. Manneh's presentence report it is, quote, The Gambia

19    and the government of The Gambia.  So when the government of

20    The Gambia is thought to have provoked this offense, that is

21    a factor in mitigation pursuant to Guideline Section 5K2.10.

22         The second guideline provision I'd respectfully

23    call to the Court's attention is the very next guideline

24    section, 5K2.11, and that guideline addresses actions that

25    are undertaken for the purpose of avoiding a greater harm or

1       some, I guess, commentators would call it the defense of

2       necessity.

3               It may not be strong enough and may not get a jury

4       instruction in front of a jury and may not see the light of

5       day in determining the question of guilt, but nevertheless

6       it's thought to be sufficiently important by the Commission

7       that it should be considered in determining whether a

8       defendant's culpability is thought to be less and not just

9       normal or not just aggravated in nature.

10              The third guideline section I'll call to the

11      Court's attention is at 5K2.12 and that guideline is

12      captioned Coercion/Distress -- Duress.  Excuse me.

13              THE COURT:  Say that again.

14              MR. LARSEN:  Sure.  That's at 5K --

15              THE COURT:  What's the title of it?

16              MR. LARSEN:  Coercion/Duress.  And what that

17      guideline says is very similar to the lesser harms guideline

18      section, that it is appropriate to consider whether

19      circumstances on The Gambia ground there in west Africa were

20      so aggregated that it presented a measure of coercion upon

21      these individuals.  Maybe not enough to get an acquittal

22      and, in fact, all of these defendants have pled guilty

23      because they are guilty, but nevertheless appropriate in the

24      view of the drafters of the guideline to be considered by

25      the court in mitigation here.

1          And finally, Your Honor, if we sort of take all of

2     those three sections, the question becomes whether the

3     guidelines permit the court or perhaps even encourage the

4     court to consider them in the aggregate.

5          And I would propose to you that the guidelines in

6     black and white do precisely that at Guideline Section 5K2.0

7     subsection (c), where the court is asked to take a look at

8     whether a combination of factors, maybe none of which

9     standing alone are sufficiently compelling, but nevertheless

10    when taken together can be considered in the aggregate as

11    grounds to give these defendants a downward departure

12    pursuant to the guidelines.

13         Unless the Court has any additional questions,

14    I've probably run more numbers and statistics by you than

15    even I want to think of.

16         THE COURT:  Why didn't you bring this to my

17    attention before now?

18         MR. LARSEN:  Well, Your Honor, in part it's

19    because we wanted to make a presentation first of what we

20    think the record should be in the case, and you were kind

21    enough to receive all of that evidence.

22         I concur with Mr. Mohring's view that 5K2.0 asks

23    the court to take a look at factors that are nowhere

24    considered in the guidelines and I think all of the four

25    grounds that Mr. Mohring articulated fit that criteria, that

```
 1    is, are there factors associated with this case that involve

 2    circumstances not even covered by the guidelines.

 3              But there are additional facts and circumstances

 4    that the record shows us as well and that's what I hopefully

 5    have been able to outline for Your Honor.

 6              THE COURT:  You're not answering my question.  Why

 7    didn't you bring it to my attention before now?

 8              MR. LARSEN:  Your Honor, we have briefed up the

 9    issue additionally.  It's in all of our papers.

10              THE COURT:  Okay.

11              MR. LARSEN:  I certainly could have gotten up to

12    the lectern first.  If I should have done that, I apologize

13    to the Court.

14              THE COURT:  Well, I bring it up in the sense of

15    there's some talk about doing the sentencing this afternoon,

16    which we're not going to do at this stage of the game.

17              MR. LARSEN:  Yes.  Thank you, Your Honor.

18              THE COURT:  Anything else we have to cover?

19              MR. LARSEN:  No.  Thank you, Your Honor.

20              THE COURT:  Mr. Mohring, are you pointing at me or

21    are you --

22              MR. RICHMAN:  Your Honor, I have some issues to

23    raise, but Mr. Kovats may want to respond to --

24              THE COURT:  Let's get all the defendants in here

25    and then you can come back and take them all on at once.
```

1          MR. KOVATS:  Very well, Your Honor.

2          THE COURT:  Mr. Richman.

3          MR. RICHMAN:  Your Honor, I wanted to address

4    3553(a).  We've been discussing the sentencing guidelines,

5    but the sentencing guidelines in this case really do not

6    provide the Court with any guidance.

7          With respect to the Neutrality Act violation of

8    Count 1 of the superseding indictment, there is no

9    guideline that applies to that offense because of how rare

10   it is.

11         With respect to Count 2, the defendants have

12   pleaded guilty to a conspiracy to use a firearm during a

13   crime of violence or a drug offense.  And while there is a

14   guideline that applies to that, it is the same guideline

15   that applies to a defendant using a gun in an armed robbery

16   or a sexual assault, a defendant using a gun to promote drug

17   activity.

18         So obviously that guideline does not contemplate

19   the conduct that we have before this Court of an attempt to

20   bring freedom to the people of The Gambia and so we're left

21   with 3553(a) to advise the Court as to a sentence under that

22   statute that is sufficient, but not greater than necessary,

23   to achieve the purposes of sentencing.

24         We've talked at length about the seriousness of

25   the offense and the nature and circumstances of the offense.

1     And while obviously it is a serious offense, that

2     seriousness is mitigated substantially by the motives of the

3     defendants in this case.

4          Obviously when we view the seriousness of an

5     offense we look at both the *actus reus* and the *mens rea*.

6     And in this case the defendants acted with a laudable, noble

7     intent.

8          Even the government in arguing that this offense

9     has affected the interests of the United States, when you

10    parse that, what the government is saying is that the

11    failure of the coup has affected the interests of the United

12    States by unleashing the unpredictability of this despotic

13    ruler.

14         Essentially the government is saying that you

15    don't poke a rabid tiger because you don't know what that

16    tiger will do, but we would all agree that we would be

17    better off without the rabid tiger.  And that was the intent

18    of the defendants here.

19         But with respect to the 3553(a) factors, the

20    government has focused primarily on the issue of deterrence,

21    both specific and general deterrence, and that's the issue

22    that I really want to focus on, although I would have to say

23    that there is nothing that I can say that would be as

24    eloquent as what we've heard in the testimony of Mr. Njie

25    and Mr. Faal with respect to whether this Court need be

1    concerned about the likelihood of recidivism in this case.

2         With respect to specific deterrence, Your Honor,

3    first of all, this is something of a myth since every

4    empirical study reflects that an increase in punishment has

5    no discernible deterrent effect and that deterrence comes

6    primarily from the certainty of prosecution and from the

7    impact that the defendants testified to earlier today of

8    having gone through what they did and standing before this

9    Court awaiting judgment.

10        But the government's position seems to be that

11   because the defendants made such a great sacrifice, even

12   risking their own lives and their families here in the

13   United States, their comfortable lives, because they made

14   such a great sacrifice, that that increases the

15   likelihood -- this seems to be the government's position --

16   that they will do so again and so therefore you need to

17   impose a longer sentence.

18        But that leads to perverse results.  That argument

19   basically stands the laudable goals that these defendants

20   had on its head by saying that if they had base motives, if

21   they were acting out of greed or out of jealousy, like most

22   defendants that appear before this Court, that that would be

23   more easily deterred than the noble goals that these

24   defendants had.

25        And I would suggest, Your Honor, that that is not

1   an appropriate argument, that these men have shown

2   themselves to be honorable men, to have been working in

3   pursuit, however mistaken their judgments may have been, in

4   pursuit of noble goals.

5          They have shown over the course of the last nearly

6   year and a half that they can be trusted.  This Court need

7   not worry about what their conduct will be on probation

8   because we have seen over the course of the last year and a

9   half their conduct on pretrial release, which has been

10  flawless.

11         The magistrate judge in this case made the

12  determination way back when that these men were not a danger

13  to the community and they were released on conditions, and

14  they have shown themselves to be honorable men who have made

15  good on their commitment to this court.  They are a danger

16  to no one.

17         With respect to recidivism, Your Honor,

18  statistically these defendants, their risk of recidivism is

19  exceedingly low.  And what is relevant to that

20  consideration, as the sentencing guidelines' own statistics

21  reflect, is the fact that they are first offenders with no

22  criminal history points, that they are over the age of 40,

23  that they had stable employment at the time of this offense,

24  that they are not drug users, that they are educated, that

25  they are married, that in every respect they are stable

1    members of this community.  That's what gives this Court

2    confidence that these men will not be back before this

3    Court.

4              What is significant, Your Honor, and compelling is

5    that these men had no idea that they were violating U.S.

6    law.  Everything they did they did in the open.  They

7    traveled under their own names.  They used their own bank

8    accounts.  They used their own credit cards.

9              When the government tried to -- took steps to

10   follow the paper trail, that was no problem because it was

11   clear because these men had no reason to believe that they

12   were violating United States law.

13             In addition, as Mr. Njie has testified to, they

14   believed that their conduct was being supported by the

15   United States.  They had information from a military attaché

16   from the Senegal -- from the U.S. Embassy in Senegal that

17   the State Department supported their efforts.

18             As Mr. Sxxxxx said, he had been interrogated by

19   the FBI, who obviously was aware of this plan, and they did

20   not arrest him, did not prevent him from going to Dakar,

21   which was consistent with their view that the U.S.

22   government would support what they were doing.

23             And it was also consistent with their view that

24   the goals that they were attempting to achieve were

25   completely consistent with the values of the United States

1   government, which were the values of their adopted country,

2   a country that they loved and that they were loyal and

3   patriotic to.

4          This was a combination of circumstances, as

5   Mr. Njie has testified to, that is not going to repeat

6   itself.  These men understand that their actions were a

7   mistake, that they acted honorably, but they now understand

8   United States law, they now understand the position of the

9   United States.  They are men who take their commitment to

10   this Court seriously, who believe in the rule of law.

11          Mr. Barrow, my client, knowing that some of his

12   compatriots had already been arrested, came back to the

13   United States to face these charges because he believes in

14   the rule of law.  And that is why this Court need not

15   concern itself with the risk of recidivism.  These men are

16   not going to be back before this Court.

17          With respect to general deterrence, Your Honor, as

18   I said at the outset, prosecutions under the Neutrality Act

19   are virtually unheard of.  There is really no one to deter

20   even if deterrence worked as a principle.  In any event, the

21   message has been received loud and clear that attempts to

22   overthrow foreign governments will not be tolerated by the

23   United States.

24          And so the government attempts to analogize this

25   case to some misguided young men who thought it was the

1       thing to do to join ISIS or al-Shabaab, which I would

2       suggest, Your Honor, that to attempt to analogize what these

3       men attempted in this case with what is going on in a

4       courtroom in Minneapolis is simply ridiculous.

5               This case is more akin to individuals going in an

6       effort to fight ISIS, to fight a terrorist organization,

7       because that is what these men were doing, was attempting to

8       free people from a despotic ruler.  Their goals were

9       laudable.

10              They are not people who have an antipathy to the

11      United States.  Quite the contrary, they support the values

12      of the United States and were acting consistent with those

13      values in taking the steps that they did.

14              Those who are misguided enough to attempt to join

15      ISIS are not going to be dissuaded by anything that this

16      Court does, because they are misguided.  They are not ones

17      to take any lesson whatsoever from what any United States

18      court does in this case or any other case.

19              And it would be fundamentally wrong, I would

20      suggest, to ignore the unique circumstances of this case and

21      use these defendants as a vehicle to send a message to some

22      unknown others.  This is a case that, because of its unique

23      circumstances, warrants a probationary sentence.

24              And finally, Your Honor, in conclusion, I would

25      like to say that I think that the government is creating a

1    false dichotomy between probation on the one hand and

2    deterrence on the other.

3          But probation is not the absence of a punishment.

4    Probation is a punishment.  In the Gall case, the Supreme

5    Court case, in which the Supreme Court upheld a substantial

6    downward departure to a probationary sentence in a serious

7    drug case, the Supreme Court made very clear that probation

8    is a punishment.  It causes severe restrictions on one's

9    liberty.  It reduces your Fourth Amendment privacy rights

10   because you can be searched.  It subjects you to close

11   supervision.

12         It is, I think, a false dichotomy for the

13   government to suggest that a probationary sentence does not

14   have a deterrent effect.  These men stand before this Court

15   now labeled as felons.  They have seen their friends shot

16   down.  They will carry the scars of this offense with them

17   for a very long time.

18         And it's our position that a probationary sentence

19   is fully consistent with the sentencing factors enumerated

20   in 3553(a).  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         Counsel.

23         MR. KOVATS:  Your Honor, what I would like to talk

24   about right now are guideline issues.  I'm not here to argue

25   3553(a) factors.  I will do that when we argue at the close

1   of sentencing.  And so what I want to do is address some of

2   the things that counsel has raised as it relates to the

3   guidelines.

4         And so first as to -- I guess maybe perhaps

5   easiest with respect to Defendant Barrow, I think that we're

6   in broad agreement as to the guidelines and how they apply.

7   I don't want to necessarily -- I think counsel will correct

8   me if I'm wrong.

9         I do have -- just for purposes of the record,

10  May 5th of 2015 an FBI agent goes to The Gambia, takes

11  pictures of the weapons that reveal that a small number of

12  them had serial numbers that were obliterated.

13        The government had long since entered into

14  agreements with all of these defendants, all but one had

15  entered a plea by the same -- or before the government

16  learned of this evidence, and we've always argued for the

17  nonapplication of this guideline.

18        I just wanted to give you sort of the background

19  on how this came about.  We've said in all of our papers

20  that we stand by our agreement.  We don't think the Court

21  should apply them.  We're offering no evidence of this fact

22  to the Court.

23        As the government has said in at least papers as

24  to Mr. Barrow first and as to Mr. Manneh, that the weapons

25  they purchased and delivered to The Gambia in support of

1    this, the serial numbers were plainly visible and we have no

2    information that they any idea that some other weapons had

3    serial numbers that were obliterated.

4              THE COURT:  So that issue is out, then?

5              MR. KOVATS:  I believe it's out, Your Honor, and

6    so I think that we'd recommend to the Court that it's out.

7              And so I think that's it as to Defendant Barrow on

8    the guidelines.

9              I argued moments ago as to Defendant Faal with

10   Mr. Mohring in response to his arguments about guideline

11   departures under Chapter 5, so I feel like I've addressed

12   guidelines as to Mr. Faal.  Obviously the firearms thing I

13   didn't discuss then, but he would fall in that same camp

14   where we recommend that those do not get applied for the

15   same reasons.

16             As to Mr. Njie, there remains the issue of the

17   leader/organizer role and the government submits that the

18   four-level adjustment upward for leader/organizer applies.

19   Probation concurs.

20             The government's papers submit evidence of why it

21   should apply and I would submit that some of the things that

22   Mr. Njie said in his examination provide further evidence of

23   his role when he talked about in August he convened a

24   meeting at his home.  I think he said home and then

25   corrected it to a hotel in Texas.

1          So the group is going to him.  They discuss

2     Gambia.  It's a fact-gathering session for him, meant to

3     guide him in formulating a plan of action, and he was made

4     aware of other efforts around the globe.  He discussed this

5     meeting with Jagne for the first time face-to-face in

6     Austin, again, a meeting at his house, and at this point he

7     learned about the plan to actually oust Jammeh.  There was a

8     second meeting in Austin, again at his house, where again

9     everybody is going to him.  There was a meeting with Sxxxxx

10    where he met him at his house in Austin.

11         He's the center of gravity for this, Your Honor,

12    not only financially, but I would say he supplied the

13    leadership.  The evidence the government has submitted in

14    its papers support this and I think that to conclude

15    otherwise I think would be ignoring the plain truth of what

16    was going on here.

17         So that leaves, at least from the government's

18    view as to guidelines, Mr. Manneh.  And the government would

19    concede the record as to Mr. Manneh on leadership and

20    organizer is not as clear as it is for Mr. Njie and what I

21    am going to do is I'm going to forward why the government

22    believes it applies and obviously the Court gets to decide

23    whether or not it does.  And so what I propose to do, Your

24    Honor, is I'll show you a few things that have already been

25    before the Court, but explain why I think they apply.

1          And what we have here is the creation of a

2     military strategy for overthrowing the regime in The Gambia.

3     The people involved in this planning are all military men.

4     And what I believe was going on here, what I understand is

5     going on from I think a reasonable interpretation of the

6     evidence is that they were behaving in a way that military

7     men do when making a plan and they follow the guidance and

8     training and experience that they have gained by their

9     service in the military.

10          And when you do that, you produce a plan for

11     others to validate.  You produce a plan for your seniors to

12     say, okay, let's do that or for your seniors to say actually

13     let's adjust it to the right or to the left.  They get the

14     intent of their boss and they attempt to achieve that.

15          And so here, Your Honor, we have -- it's

16     Attachment 1, I think this is to Defendant Barrow's

17     sentencing position paper, and we talk about things that I

18     think are -- that I would submit are -- I'll point to this.

19     This is Army doctrine here, Your Honor.  They talk about

20     execution.  They talk about ways, lines of effort, and means

21     on page 4.  This is Army doctrine.  This is how people plan

22     a military operation.  This isn't something penned in on the

23     back of a napkin, Your Honor.  This isn't without guidance

24     from what they've learned in the military about how to plan

25     a military operation.

1           And so Barrow and others who had this experience

2     made a plan and it went to Defendant Njie and Defendant

3     Manneh to validate.  And when this plan was delivered, in

4     Attachment 3 to the government's sentencing papers for

5     Defendant Manneh, he says, "Che, this plan you sent does it.

6     I made a minor adjustment (added the implementation

7     timetable to the list - just a suggestion).  I have also

8     attached the list of ministries and the other document that

9     I originally prepared."

10          And so what I would argue to the Court is this is

11    validation by the leadership of the plan put together by the

12    planning cell, by the people responsible for putting

13    together the military plan, and they validated it.  They

14    made some recommendations for changes, but they're the ones

15    who decide, they were the deciders.

16          The other point I'll have on guidelines as to

17    Mr. Manneh has to do with the firearms.  I think it's a dead

18    issue.  I have one point I would like to raise and that's

19    because -- and maybe this is more of a policy thing, but as

20    I stand here as a representative of the United States and a

21    representative of the U.S. Attorney's Office and in my own

22    capacity as an assistant United States attorney, the

23    accusation that we breached the agreement I take very

24    seriously and so I am here to address that.

25          And I know counsel took a more conciliatory tone

1    today, but I would say that when the government said in its

2    papers that the four-level adjustment should not be applied

3    and we stand by the calculations in the agreement, that was

4    unambiguous.  No other counsel for any other defendant took

5    it any other way.

6            But here in their papers they suggest the

7    government meant something different when they said that

8    they should not apply and we take issue with that, Your

9    Honor, and I think the Court should, I think, repudiate the

10   notion that the plea agreement was violated when the United

11   States --

12           THE COURT:  That issue I don't consider to be in

13   front of me.  I'm not going to repudiate anything.

14           MR. KOVATS:  Yes, Your Honor.

15           And so I think if I go through my list, I think,

16   as to the guidelines -- well, I will submit to the Court if

17   you have any questions of the government as to our guideline

18   calculations, we stand by them in the plea agreement, we

19   believe that they're appropriate here, and we believe that

20   although there's a dispute as to leader/organizer as to

21   Mr. Njie and to Mr. Manneh, I believe that they should be

22   applied in both those instances.

23           Thank you, Your Honor.

24           MR. BIRRELL:  If I might just address you for a

25   minute?  May I?

1              THE COURT:  You may.

2              MR. BIRRELL:  Thank you.  I wasn't entirely sure

3      about this procedure because it got into a little bit of an

4      individual assessment on Mr. Njie's role.

5              And I wanted to just point out to the Court that

6      this was a military operation.  The Court knows from the

7      presentence report that Mr. Njie was in the military for a

8      week and then broke his ankle and was forced to separate

9      from the service.

10             But the testimony that he presented today was that

11     Sanneh was the operational leader of the enterprise.

12     Mr. Njie has no background at all upon which to design or

13     compose a military operation of any kind.

14             Where the meetings were taking place are not

15     determinative of any leadership role.  It may be, for

16     example, that as an older man in the culture it was

17     customary for people to come and see him.

18             But the totality of the analysis on role in the

19     offense, which was a military offense, counsels, as we've

20     set out again and again in our papers, that Mr. Njie was not

21     capable of a leadership role in the offense and the Court

22     should not apply the enhancement to him.

23             Thank you.

24             THE COURT:  Okay.  Anything else?

25             MR. KOVATS:  No, Your Honor.

1          MR. MOHRING:  No.

2          THE COURT:  I want to talk with counsel -- I don't

3     think everybody else has to stick around -- just about the

4     schedule for sentencing and some other issues.  So why don't

5     you come back here and we'll go into a conference room.

6          This won't take very long.  Anybody who is in the

7     audience waiting for the lawyers, they will be out of here

8     in 10 or 15 minutes, but I want to talk to them off the

9     record.

10        (Court adjourned at 12:05 p.m.)

11                         *      *      *

12

13

14        I certify that the foregoing is a true and correct
      copy of the transcript originally filed on 07/21/2016 and
15    incorporating redactions requested by Attorneys Mark Larsen
      and Andrew Mohring.  Redactions appear as XXX or blackened
16    out in the transcript.

17

18              Certified by:   *s/ Lori A. Simpson*

19                         Lori A. Simpson, RMR-CRR

20

21

22

23

24

25