UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                )
United States of America,       )   File No. 15-CR-35
                                )              (RHK/HB)
        Plaintiff,              )
                                )
vs.                             )   St. Paul, Minnesota
                                )   May 12, 2016
(1) Cherno Njie,                )   1:00 p.m.
(2) Alagie Barrow,              )
(3) Banka Manneh,               )
                                )
        Defendants.             )
                                )
------------------------------------------------------------
                                )
United States of America,       )   File No. 15-CR-28
                                )              (RHK)
        Plaintiff,              )
                                )
vs.                             )   St. Paul, Minnesota
                                )   May 12, 2016
Papa Faal,                      )   1:00 p.m.
                                )
        Defendant.              )
                                )
------------------------------------------------------------


BEFORE THE HONORABLE RICHARD H. KYLE
UNITED STATES DISTRICT COURT JUDGE

**(SENTENCING HEARING)**








Proceedings recorded by mechanical stenography;
transcript produced by computer.


LORI A. SIMPSON, RMR-CRR
(651) 848-1225

1    APPEARANCES

2       For the Plaintiff:          U.S. Attorney's Office
                                    CHARLES J. KOVATS, JR., ESQ.
3                                   600 U.S. Courthouse
                                    300 South Fourth Street
4                                   Minneapolis, Minnesota 55415

5       For Defendant Cherno        Gaskins, Bennett, Birrell,
        Njie:                       Schupp, LLP
6                                   ANDREW S. BIRRELL, ESQ.
                                    Suite 2900
7                                   333 South Seventh Street
                                    Minneapolis, Minnesota 55402
8
        For Defendant Alagie        Joseph S. Friedberg, Chartered
9       Barrow:                     JOSEPH S. FRIEDBERG, ESQ.
                                    Suite 300
10                                  701 Fourth Avenue South
                                    Minneapolis, Minnesota 55415
11
                                    ROBERT D. RICHMAN, ESQ.
12                                  P.O. Box 16643
                                    St. Louis Park, Minnesota 55416
13
        For Defendant Banka         Lindquist & Vennum, PLLP
14      Manneh:                     MARK D. LARSEN, ESQ.
                                    Suite 4200
15                                  80 South Eighth Street
                                    Minneapolis, Minnesota 5542
16
        For Defendant Papa          Office of the Federal Defender
17      Faal:                       ANDREW H. MOHRING, ESQ.
                                    Suite 107
18                                  300 South Fourth Street
                                    Minneapolis, Minnesota 55415
19
        Court Reporter:             LORI A. SIMPSON, RMR-CRR
20                                  Suite 146
                                    316 North Robert Street
21                                  St. Paul, Minnesota 55101

22

23

24

25

**P R O C E E D I N G S**

**IN OPEN COURT**

(Defendants present)

THE COURT:  We have several matters on the Court's calendar this afternoon.  I will just note those for the record.  United States of America vs. Njie, which is Criminal File No. 15-35; United States of America vs. Barrow, B-a-r-r-o-w, which is 15-35-2; Papa Faal, 15-28; and Banka Manneh, 15-35-3.

So let's start with the appearances on each of those cases and we can start with whatever order we have.  Let's start with the government.

MR. KOVATS:  Good afternoon, Your Honor.  Charles Kovats for the United States.

MR. BIRRELL:  Good afternoon, Your Honor.  Andy Birrell with Mr. Njie, who is present before the Court.

MR. RICHMAN:  Robert Richman and Joseph Friedberg for Alagie Barrow, who is also present.

MR. LARSEN:  Mark Larsen for Banka Manneh, Your Honor, who is before the Court and prepared to proceed.

MR. MOHRING:  And Andrew Mohring here with Papa Faal this afternoon.

THE COURT:  Well, I think as counsel -- I guess everyone knows we are here for imposition of sentence in each one of these cases.  Each of these defendants has

1    previously entered pleas of guilty to various -- or at least

2    two separate federal statutes and the Court has accepted

3    those pleas.  Now we are down to the final phases of this

4    trial [sic], which would be the sentencing.

5          We will hear from the lawyers on behalf of each of

6    the defendants.  The defendants will also have a chance to

7    be heard themselves if they wish to do so, but that's

8    entirely voluntary on their part.

9          Before we start, let me just make one comment.

10   I've received on behalf of the defendants I think about -- I

11   tried to add it up this morning -- some 60 letters, all

12   basically supporting the defendant.  They are pretty evenly

13   divided: 15, 19, 18, 14.  Those letters stay in my file,

14   they are not part of the public record, but I preserve them

15   in case they're needed for some purpose.

16         But I want to say to those who wrote those

17   letters, assuming that many of you are here today, that I

18   appreciate getting them.  It tells me something about the

19   defendants that I don't find out in any other way than

20   neighbors, friends, colleagues and the like.  So I get a

21   little better picture of who I'm dealing with.

22         And you don't get that -- I have had any number of

23   cases where I am coming in here with individuals facing

24   lengthy prison sentences and basically the courtroom is

25   entirely empty, which is sort of a sad, sad situation.

1          But this tells me that these individual defendants

2     have support.  And to the extent that any of them are going

3     to have a prison term, that support, I suspect, will be

4     there when they complete whatever term is given.  I hope

5     that's the case.  But in short, thank you all for coming.

6          We're going to start with, I guess, Njie.  Is that

7     the right one?  I think that was number 1.

8          MR. BIRRELL:  En-jie [phonetic], Your Honor.

9          THE COURT:  I'm sorry.

10          MR. BIRRELL:  Your Honor, my understanding from

11     speaking with Mr. Kovats was that the proposal would be that

12     he would speak as to all the defendants and then we would

13     speak as --

14          THE COURT:  That's fine.  I have no problem with

15     it.  Anybody else have any objection to that?

16          MR. BIRRELL:  Thank you, Your Honor.

17          THE COURT:  Counsel.

18          MR. KOVATS:  Thank you, Your Honor.  First, I

19     intend to be relatively brief.  We've submitted a lot in

20     written form and I had an opportunity to speak on Tuesday.

21          THE COURT:  I've heard that before.

22          MR. KOVATS:  Right.

23          THE COURT:  Not from you necessarily.

24          MR. KOVATS:  Right.  And so the one thing I didn't

25     speak about on Tuesday was the 3553(a) factors because I

1    feel that it's my belief that they apply not in the same way

2    as to every defendant, but generally so.  And so I thought

3    it might help to start out with the government's view on

4    3553(a).  I may at the end of this speak a minute to respond

5    to defense counsel, but I don't anticipate doing that at

6    this point.

7          I want to start with the big picture, at least how

8    the government sees this.  And what I would submit to you is

9    we have two main arguments from the defense, the defendants

10   generally, and that is that these defendants are good

11   Americans who acted with noble intentions.

12         The government doesn't dispute that these men have

13   proven themselves to date as good Americans.  In the room we

14   have two veterans of our armed forces and we have a third,

15   Mr. Njie, who attempted himself to join.  By any measure

16   before engaging in the crimes at issue, all were good and

17   productive and proud American citizens.  They worked hard

18   and they cared for their families.  They were well employed.

19   They cared about the greater community in which they lived.

20   That's not in dispute here, Your Honor.

21         The second argument, such as it is, is the defense

22   argument that the regime in Gambia needed to go because it

23   was abusive and undemocratic, violent to its own citizens at

24   home and abroad.

25         The United States through the State Department has

1    issued reports decrying the human rights record of

2    The Gambia, talking about the torture and arbitrary arrest

3    and prolonged pretrial and incommunicado detention and

4    forced disappearances of its own citizens, and government

5    harassment of the regime's critics. This also isn't in

6    dispute.

7          At the same time the government would like to

8    caution the Court about weighing this too heavily. On

9    Tuesday I spoke to the Court a bit about the government's

10   interest in this regard and, in fact, the more erratic and

11   abusive the foreign government at issue is, in some ways the

12   more dangerous the consequences are for actions like this.

13         But anyway, big picture. We don't dispute these

14   are good citizens. We don't dispute the flaws that the

15   regime has. The government's interest here is that

16   notwithstanding those things, what was done here is not

17   okay. We don't get to go abroad with a private army to do

18   private foreign policy and tip over foreign governments.

19   That's not okay.

20         All right. So that's the big picture. From that

21   I would like to zoom in a little bit and address a few

22   points raised by counsel in papers and on Tuesday.

23         The chief one is the one raised by Defendant Njie,

24   that he believed the United States government supported his

25   plot to overthrow the regime based on conversations that he

1     was aware of between another member of the conspiracy and a

2     lieutenant colonel in the service and his own direct

3     conversations with a sergeant in the Army and suggested

4     those conversations caused him to believe the government

5     would support their plan.

6            And I would say this belief -- which may, in fact,

7     be true, that he believed these things.  What I'm suggesting

8     is that belief is not reasonable under the circumstances and

9     is undermined by the fact that his defendant -- or his

10    co-conspirator, Sanneh, the one who had the conversation

11    with the lieutenant colonel, when asked about why he was

12    traveling to West Africa lied about it.  He said he was

13    going to visit his brother.  That part might be true, but he

14    concealed the true purpose of his travel.  And if the

15    government was supportive of this and if the defendant

16    believed that to be the case, why would they be lying about

17    it?

18           Secondly, the government has reviewed a lot of

19    e-mail that the defendants have exchanged during the

20    pendency of the conspiracy and I would submit to you that

21    if, in fact, they had the blessing of the government -- I'm

22    going to put before you Defense Exhibit 2 just to remind the

23    Court.

24           THE COURT:  Are you going to have a lot of

25    exhibits?  I can put the big screen up too.

1          MR. KOVATS:  I have a few, Your Honor.

2          THE COURT:  Let's put it up anyway.

3          MR. KOVATS:  Okay.  And I'm not going to go

4     through this in detail.

5          What I would say is these defendants engaged in a

6     determined and a longstanding and I would say admirable

7     campaign to get components of the United States government

8     to help them achieve their goals in The Gambia.  And you

9     heard on Tuesday how they met with congressmen, how they met

10    with senators, how they met with members of the State

11    Department, how they met with anybody they could get an

12    audience with with the United States government to get

13    traction.

14         And I would submit to you that if Mr. Njie or the

15    other defendants actually believed the government was on

16    board, there would have been a lot of discussion about that

17    point because it would have represented a reversal of

18    22 years of pounding on doors and getting nowhere.  And the

19    fact is there wasn't any such e-mails, there weren't any

20    discussions because it wasn't true.

21         The fact that they used code names as well, the

22    fact that they marked their documents as secret also

23    suggests that this wasn't something that they actually

24    believed the government endorsed.

25         I want to talk a little bit about 3553(a), Your

1    Honor, and the basis for departures and the like.  First I

2    want to talk a little bit about deterrence.

3              Counsel for at least one defendant had suggested

4    that deterrence isn't effective and it ought not be

5    considered by the Court when constructing a sentence here,

6    and I would respectfully disagree.  I'm not saying that

7    deterrence is that factor that the Court should consider

8    first, but I do not think it should be dismissed in whole.

9    3553(a) enumerates that this is something that Congress has

10   asked the court to consider and we shouldn't accept the

11   defendant's invitation to ignore it.

12             But why is it appropriate?  And I know that the

13   Court has indicated that the letters written by members of

14   the community would remain sealed.  I would like to present

15   one of them, however.  It's written by an organization and

16   not an individual, so I feel more comfortable presenting it

17   here today.  And I don't want to suggest that this letter is

18   necessarily emblematic of everybody's, but it does cause the

19   government concern.

20             And I will put it up here.  This is part of

21   Document 143 and it's a letter from the Gambia Consultative

22   Council and I underlined, "Given the circumstances in which

23   Gambians both at home and abroad find themselves in, the GCC

24   has never wavered from its position of forcible removal, if

25   necessary, of a military regime...."

1          And so obviously in the government's view this is

2     cause for some concern.  It's at least reason, Your Honor,

3     not to say deterrence shouldn't inform the government's --

4     or rather the Court's sentence here.  We shouldn't throw it

5     away.  I believe that this letter evidences the fact that

6     there are people in the community who might stand to learn

7     from the Court's sentence.

8          The movie itself also discussed the fact that --

9     discussed the nobility of the actions of these men and also

10    suggested that streets would be named for them and other

11    things like that that suggested that there was heroism

12    involved.  And it's those tone of things -- I'm not sure

13    where the line is, but it's that tone that suggests that

14    others might choose to follow in their footsteps to achieve

15    what they've achieved.

16         I'd also talk -- I would like to talk a little bit

17    about the seriousness of the offense, Your Honor, and I

18    would suggest to you that the Court's sentence should seek

19    to do that.  I would also submit to the Court that a

20    probationary sentence would fail to achieve that.

21         This is a photograph -- one photograph that was in

22    all of the government's written submissions and it just

23    speaks to the violence that was unleashed in the capitol of

24    The Gambia on the night of December 30th of 2014.  Three

25    members of the conspiracy were killed.  We can't forget that

1     when talking about what sentence is appropriate today.

2              This was a serious offense, Your Honor.  People

3     died.  The people who died perhaps might have been willing

4     to die for their cause, but as the fusillade of bullets were

5     let loose that night, other people could have died, Your

6     Honor.

7              And in the declaration of David Wharton, who is a

8     senior official in the State Department, he talked about --

9     I don't need to put it in front of you, Your Honor, but he

10    talked about the danger to U.S. citizens as a result of this

11    and he talked about the warnings that went out through the

12    State Department through the embassy warning American

13    citizens about the situation in Banjul as a result of these

14    actions.

15             I'd also submit to you that the seriousness of the

16    offense, the raising of the private army, the smuggling of

17    weapons overseas, the private foreign policy, that a

18    sentence of probation just doesn't address those concerns or

19    those actions.

20             I'd turn to another photograph.  This was a big

21    deal, Your Honor.  There was an arsenal of weapons smuggled

22    into The Gambia to go do violence.  And I think that some

23    may argue that the ends justify the means here.  I think

24    there's been an argument made that peaceful means never

25    achieved success, they didn't work.  We tried to do it

1      peacefully.  It didn't work.  At the same time peaceful

2      means are lawful means.  Violent means didn't work either

3      and they're unlawful.

4              And I'd end with where we started with on Tuesday,

5      which is a quote from Martin Luther King, which I think was

6      the lead on the movie that was played, a very good movie, a

7      very compelling movie.  "He who passively accepts evil is as

8      much involved in it as he who helps perpetrate it.  He who

9      accepts evil without protesting against it is really

10     cooperating with it."

11             And protesting may not be effective the first time

12     or the second time or the third time.  It may never be

13     effective.  But violence, Your Honor, wasn't the answer.  It

14     isn't the answer and it won't be an answer the next time,

15     and I think the Court's sentence should reflect this

16     analysis.

17             And with that, Your Honor, I'll submit.

18             THE COURT:  Thank you.

19             Counsel, you may proceed.

20             MR. BIRRELL:  Thank you.  Your Honor, as to the

21     motion for departure, I believe we have fully presented our

22     thoughts to the Court both in our written papers and in our

23     presentation and argument at the evidentiary hearing.  So

24     what I would propose to do today is to share with the Court

25     my thoughts about sentencing and my arguments in support of

1    a motion for a variance in addition to the motion for a

2    departure, if that is agreeable with you, Your Honor.

3              THE COURT:  It's agreeable.

4              MR. BIRRELL:  Thank you.  Your Honor, my

5    great-grandfather came from Germany and became a United

6    States citizen and one of the most ardent Americans who ever

7    lived, and it's hard for me to believe that if he had gone

8    back to Germany in 1940 when we were at peace with Hitler's

9    regime and tried to effect a change that he would have been

10   hauled into a United States district court to answer for

11   that.  And I think that that is the historical context

12   against which the Court should measure the conduct of these

13   brave men who stand before you today.

14             The United States attorney has told the Court that

15   these are good men, they're good Americans.  And they are,

16   every one of them.  You've heard about them.

17             People ask me why I defend people in criminal

18   cases sometimes and one of the reasons I do that is that

19   every once in a while I get to represent somebody like

20   Cherno Njie, who I've gotten to know over the last 18

21   months.

22             And you've known me for a long time, Your Honor,

23   so you know that whatever I tell you I believe.  And I will

24   tell you that I have never met a person who I have more

25   admiration for, who I respect more, including people in my

1    own family, than Mr. Njie.  He is an amazing man, Your

2    Honor.

3           This is a man who grew up basically in a mud hut

4    without indoor plumbing and came to the United States,

5    educated himself, graduated from one of the most prestigious

6    public institutions in the United States.  With special

7    honors he graduated.

8           He made himself a success both in business and in

9    life; has contributed mightily to his community, as you can

10   see in those letters; and who at the ripe old age of 57

11   years, which as a 60-year-old guy I can appreciate now, who

12   had more money than he would ever need, a more comfortable

13   life than most people will ever have, a young wife and

14   children, decided to put his life on the line.

15          He went into The Gambia, which in my view, Your

16   Honor, is the absolute functional equivalent of traveling to

17   Nazi, Germany, in 1940, and tried to do a good thing.  He

18   tried with these other brave men to try to liberate a

19   country from one of the most despicable individuals in the

20   world.

21          And I hope Mr. Jammeh is watching today and I hope

22   he watches the proceedings in the United States of America

23   and the United States District Court with the same level of

24   interest that he watches people on TV being tortured in his

25   torture cells because I hope he learns something.

1          The government's interest in this case, it seems

2     to me, Your Honor, was to bring the case.  The reason they

3     needed to bring the case, Your Honor, was to vindicate the

4     authority of the government, as I said in my papers, to

5     conduct foreign policy.  And they have made their point.

6     They have the undoubted authority to conduct foreign policy.

7          There is no reason to incarcerate my client or any

8     of these men.  These are good men.  They were willing to put

9     their lives on the line for the rule of law.  They have come

10    to court and told the Court what it is they did.  They've

11    submitted to the Court's authority.

12          More than anyone, Your Honor, you can be sure that

13    these people will do what the Court tells them to do on

14    probation.  I mean, these are people who so respect the rule

15    of law that they were willing to die for it to give it to

16    other people.

17          The deterrence argument is not a real argument.

18    To suggest that because their brave comrades died that you

19    should punish these men is to turn logic on its head, to

20    make smaller a sacrifice that other people have made.

21          These are not bad people that need to be punished.

22    What the community needs to see and what Jammeh needs to see

23    is that justice can be tempered with mercy in the right

24    circumstances; and these are the right circumstances, Your

25    Honor.

1          Mr. Njie believed that the government of the

2     United States was willing to accommodate this enterprise and

3     he was wrong, but he had reason to believe it.  It's

4     undisputed, Your Honor, that the FBI was told in October of

5     2014 that Mr. Sanneh was involved in plotting a coup to go

6     back to Gambia.  There is no dispute that that is a fact.

7     And there's no dispute also that they went -- the FBI in

8     Baltimore interviewed him December 16, 2014.  Now, it is

9     true that he didn't tell the line FBI guys what he was up

10    to, but that certainly was not the level on which he was

11    operating.  And given that and the other involvement in the

12    case, Your Honor, it seems to me a certainly reasonable,

13    albeit wrong, conclusion that Mr. Njie had.

14          But at the end of the day, Your Honor, this is a

15    good man.  These are all good men and the right thing to do,

16    Your Honor, in my view is to put them on probation.

17          I believe Mr. Njie has a statement he wishes to

18    make to you.

19          THE COURT:  You may proceed.

20          DEFENDANT NJIE:  Thank you, Your Honor.  Please

21    allow me to take a few moments to thank my family, my wife,

22    and my brother for being here.  They have been very

23    supportive during this very difficult period, as well as

24    some other family members who couldn't make it here and are

25    in Texas.

1          I would also like to thank the Gambian community

2    in the Twin City area for their support and prayers.  I

3    would like to single out Cherno Bah and Yero Jallow

4    specifically for their tireless efforts to help in

5    supporting the defense team and for all their thoughts and

6    prayers.

7          Finally, I would also like to thank the legal team

8    for doing an excellent job during this process.

9          Your Honor, in our zeal to end the tyrannical

10   regime of Yahya Jammeh and transition to an inclusive

11   democratic government, we violated U.S. law.  That was

12   wrong.  We should not have done it.  I deeply regret my part

13   in the offense.  It will never happen again.  We acted in

14   the belief that our action was not unlawful and had the

15   blessing of the government of the United States.  This too

16   was a mistake.

17         Our hearts go out to all those in The Gambia

18   suffering under the dictatorial rule of Yahya Jammeh.

19   Dr. King reminds us that the arc of the moral universe is

20   long, but it does bend towards justice.  My colleagues and I

21   have resolved ourself to patiently wait for justice to come

22   to The Gambia.

23         Thank you, Your Honor.

24         THE COURT:  Thank you.

25         I think we will just go through each of them and

1     then we'll come back and --

2               MR. BIRRELL:  Yes.  Thank you.

3               THE COURT:  Mr. Richman.

4               MR. RICHMAN:  Thank you, Your Honor.  This is on

5     behalf of Alagie Barrow.  Your Honor, it has been my great

6     honor to represent Alagie Barrow and to get to know him over

7     the course of the last 18 months.

8               When I first met him I immediately wanted to

9     become involved in his case because rarely do I have an

10    opportunity as defense counsel to stand before the court and

11    say that the world would be a better place had he been

12    successful in his criminal conduct, and I think that

13    everyone who is sitting behind me observing would agree with

14    that sentiment.

15              Even the government has made very clear that its

16    concern was with the erratic behavior of Jammeh with respect

17    to the failure of the coup, but it has never once offered

18    the opinion that its interests are somehow allied with the

19    Jammeh regime.

20              And while the government refers to Jammeh or the

21    Gambian government as a rival of the United States, that was

22    the term that the government used on Tuesday, I think it

23    would be more candid to say that that regime is a menace on

24    the international stage.

25              It's clear that what Mr. Barrow did, like the

1   other defendants, he did not out of selfish motives, but to

2   help others.  And what is so exemplary about Mr. Barrow is

3   that that is typical of his outlook about life.

4         In 2001, after September 11th, he joined the Army

5   National Guard because given what had happened, he wanted to

6   serve his adopted country.  And I would suggest, Your Honor,

7   it was the same impetus, the same pang of conscience that he

8   felt in 2001 when he joined the Army National Guard that

9   catalyzed his conduct in this case.

10         He served in the National Guard from 2001 to 2014

11   at various times during that time as his full-time position,

12   but more, Your Honor, as the letters to the Court reflect,

13   Mr. Barrow has always made service to others a top priority

14   for himself.

15         He was a volunteer for new immigrants, an advocate

16   for new immigrants as a volunteer.  Most recently while he

17   has been on pretrial release, he has been working with

18   disabled adults, helping to care for young adults who are

19   unable to care for themselves, which is work that he has

20   found extremely rewarding.

21         There are many people who continue to depend on

22   Mr. Barrow.  He has a family, his wife.  He has three

23   children.  He and his wife have a 7-year-old son, he has a

24   13-year-old daughter from a previous relationship who lives

25   with his wife and Mr. Barrow, and he has a 9-year-old child

1     to whom he pays child support.

2          But in addition, Your Honor, he has his family in

3     The Gambia who continues to depend on him.  His elderly

4     mother remains in The Gambia.  He has many relatives who

5     rely on remittances from Mr. Barrow for their support.

6          Your Honor, everything that Mr. Barrow has done in

7     his life up to this crime has been exemplary and I would

8     suggest that that conduct, that record of a lifetime has not

9     been tarnished by this crime.

10         This is a man who left The Gambia, came to the

11    United States in 1996 at the age of 23.  He applied for

12    political asylum because he himself had been persecuted and

13    tortured by the Jammeh regime and was granted political

14    asylum, as a result of which he is now a U.S. citizen.  He

15    went to college here.  He got his master's degree.  He

16    served honorably in the military, as I've indicated.

17         Mr. Barrow is not a zealot.  He recognizes that it

18    is now up to the Gambian people in that country to take

19    control of their own fate and accomplish change.  And while

20    the government has made reference to statements from the

21    Gambia Consultative Committee, I would suggest that those

22    sentiments relate to the position of the people in

23    The Gambia who are required to do what they can to implement

24    regime change in that country.

25         And so while the government has urged this Court

1    to send a message to promote deterrence through a harsh

2    sentence in this case, the message that I'm concerned about

3    is the message that will be sent to the people of The Gambia

4    if this Court chooses to impose prison sentences for these

5    men.

6         The message to those people will be that the

7    United States turns a blind eye to their suffering.  Worse,

8    they may draw the conclusion that the United States is

9    opposed to any efforts to overthrow their repressive regime

10   and that the United States actually supports the Jammeh

11   administration.

12        It is not likely that the people of The Gambia

13   will be able to make the subtle distinction of the law that

14   makes the Neutrality Act applicable to American citizens in

15   this country and not applicable to the people in The Gambia.

16        What they will see is that Gambian-Americans

17   attempted to overthrow this repressive regime and were sent

18   to prison as a result of it.  They will see it as support

19   for the Jammeh regime and could be crushing with respect to

20   any blossoming effort to overthrow that regime.

21        But ultimately, Your Honor, I would suggest that

22   this is not a case about sending messages.  This is a case

23   about, as every case is, doing justice.  And I would join in

24   the remarks by Mr. Birrell.  I think this is a case that

25   applying the 3553(a) factors, the sentence that is

1    necessary, but not greater -- is sufficient, but not greater

2    than necessary, to achieve the purposes of sentencing is a

3    probationary sentence.

4           That sentence, in light of all of the

5    circumstances of this case, does not inadequately reflect

6    the seriousness of the offense.  It is the appropriate

7    disposition and we ask the Court to impose it.

8           Thank you, Your Honor.

9           THE COURT:  Thank you.

10          MR. RICHMAN:  And I think that Mr. Barrow has some

11   comments as well.

12          THE COURT:  Mr. Barrow.

13          DEFENDANT BARROW:  Yes, sir.  Good afternoon, sir.

14   Over the last 20 years three events have shaped my life

15   significantly.

16          In early 2001 I had a job, I was expecting my

17   first child, and I was in college.  I felt at ease with

18   where I was in life and I was thinking about joining the

19   military, but I couldn't decide on what branch to join.

20   Then September 11, 2001 happened.  There's a saying that to

21   whom much is given much is expected.

22          I called my recruiter at that time, Sergeant First

23   Class Howse, now retired, and I told her I was ready to go

24   to training.  I wanted to join the Army.  She asked me what

25   job I was interested in and I told her I didn't care.  She

1    asked me if I wanted to be a cook.  I said whatever it took.

2    All I wanted to do was to defend the people of America that

3    gave me so much.

4         That following January I went to training and

5    while I was in class in April of 2003 in college I received

6    a call that we were to report to our unit for onward

7    deployment to an unknown destination.  In more than a decade

8    of military service, I've never hesitated when called upon

9    to defend the people of this nation.  My decision to join

10   the U.S. Army in 2001 and the lessons I learned imbued in me

11   a moral responsibility to defend those that gave to me.

12        I had a pretty successful military career, but the

13   conditions of my people back home, mothers being raped,

14   fathers being disappeared, and my fellow countrymen dying in

15   the waters of the Mediterranean wouldn't allow me to rest

16   easy.  I suffered anxiety and could not sleep at night.  I

17   could hear the wailings of a mother as she was being accused

18   of being a witch by the government.  I could see the agony

19   of a father beaten into a pulp by the government, the tears

20   of a cousin's sister who was forced to be raped by the

21   authorities.  I could not be myself.  These were my people.

22   These are my blood, my countrymen.

23        And despite my efforts at encouraging sanity back

24   home through democratic means, I realized it was becoming an

25   exercise of diminishing returns and so when my brother asked

1    me to help with a group that planned to restore sanity back

2    to our homeland, I accepted to help out.  My mission was to

3    look over their plans and just help them out with their

4    planning.

5         Meanwhile, conditions back home were getting worse

6    and a friend of mine that I met in the military shared with

7    me that -- he shared a George Bush quote with me.  "The

8    American dream means giving it your all, trying your

9    hardest, accomplishing something, and then I will add to

10   that giving something back.  No definition of a successful

11   life can do anything but include serving others."  These

12   were values that were imbued in me throughout my journey in

13   the military.

14        How could I help with a plan that I couldn't risk

15   my life for?  When it became apparent that my involvement

16   required more than a cursory glance of what my countrymen

17   drew, I joined in.

18        The second incident that is shaping my life is

19   what I am going through right now, a desire to provide for

20   my people simple freedom.

21        Since being released from the custody of the

22   United States I've had the privilege of working with

23   mentally disabled young men.  Prior to that, prior to any of

24   this happening, I used to volunteer at the VA centers and

25   work with senior citizens at veterans centers.  I taught

1    classes -- civic classes to new immigrants to the United

2    States because I believe in the values that the United

3    States promoted.

4         The two gentlemen I work with can barely function

5    on their own.  They require complete help when they wake up.

6    I have to help shave them, give them a bath, cook for them,

7    take them out in the community because they can't function

8    on their own.

9         But these two gentlemen have taught me so much as

10   a man and as a human being, that all we have is one another.

11   I love being around them as much as they love being around

12   me and I wish to involve myself more in their world and help

13   them be able to function on their own in a better capacity.

14   I also have about 30 people whose livelihood depend on me.

15        I'm not a bad person, sir.  I'm not a terrorist.

16   I've never acted against the interests of the United States.

17   I was a public affairs officer.  I stood for the policies of

18   the United States.  I defended them in the military to other

19   people outside of the United States.

20        And a child never hurts the mother that took him

21   in when another child from his blood mother violates and

22   banishes him from home.  The United States is like a

23   motherland for me that took me in when I was left out in the

24   cold with nobody to help.  There is nothing within me or in

25   me that would go out and hurt a mother that took me and made

1      me the better person that I am today.

2              Robert McCracken said that, "We on this continent

3      should never forget that men first crossed the Atlantic to

4      find soil for their plows" -- "not to find soil for their

5      plows, but to secure liberty for their souls."  I crossed

6      the Atlantic to secure liberty for the souls of my people.

7      I had no idea whatsoever, nothing, that my actions were in

8      contravention of United States laws.

9              While I am heavily influenced by the republican

10     values of this great nation and the values that it was

11     founded upon, I never thought of myself as an American going

12     to Gambia to secure liberty.  I saw myself as a Gambian

13     because it is my family being killed in The Gambia, even

14     today this very minute as I stand here before you, sir.

15             It was the great Ronald Reagan who said, "The

16     world must see an America that is morally strong with a

17     creed and a vision.  This is what has led us to dare and

18     achieve.  For us values count."

19             I took full responsibility for my actions when I

20     flew across two continents.  After my peers here were

21     arrested, I flew from Asia to Europe to here to turn myself

22     in to the authorities and I stand before you here today

23     assuming full responsibility for my actions and asking for

24     mercy from the Court.

25             Thank you.

1          THE COURT:  Thank you.

2          Counsel.

3          MR. LARSEN:  Good afternoon, Your Honor.

4    Mr. Manneh now stands before the Court.  I have only a few

5    comments for the Court's consideration.  I must say I concur

6    with the comments of my peers previously having been made

7    from the lectern to Your Honor this afternoon and I would

8    adopt them as Mr. Manneh's positions as well.

9          There are, however, a few unique aspects of this

10   case.  I'm not going to rehash what you have heard

11   previously, but there are a few unique aspects of this case

12   as applicable to Mr. Manneh that I would like to call to

13   Your Honor's attention.

14         Mr. Manneh does respectfully seek a term of

15   probation here, Judge.  We view that as a substantial

16   punishment that would be sufficient to comply with the

17   statutory goals and elements of sentencing that Congress has

18   told us about in Section 3553.  I did go back and take a

19   quick look at the statute this morning before driving over

20   here to St. Paul.

21         THE COURT:  Always a good idea to know what it

22   says.

23         MR. LARSEN:  Always a good idea to take a look at

24   what the law is, and there's obviously many factors and it's

25   a long statute and I could probably waste a lot of time

1    going through all of the elements here.

2            But there's one element in particular that jumped

3    off the page at me in this case in a way totally out of

4    proportion to my prior experience in handling cases in this

5    courtroom and it jumped off the page at me in a manner

6    sufficient to have me realize that no matter what one does

7    as a lawyer, and for goodness' sake you probably experienced

8    this yourself before you took the bench, you've just never

9    really seen it all.

10           There's always the case that teaches us something

11   more, something more about our obligations to justice, our

12   obligations to the court, and equally important our

13   obligations to our clients.

14           Because what I saw when I looked at the statute

15   today was that not only is the Court to consider, as the

16   United States has pointed out here, the nature and

17   circumstances of the offense, but in the very same

18   subsection of the statute it tells us and the history and

19   characteristics of the defendant, this man.

20           And those aspects of this case have taught me so

21   much over the past 14, 15 months that looking back on it,

22   Judge, I'm frankly overwhelmed at what I have learned from

23   this case because this man, Your Honor, shows us a history

24   and shows us characteristics that are just off the charts in

25   terms of their positive impact on all that he comes into

1    contact with.

2            Now, Your Honor is going to hear from him in just

3    a few moments.  He isn't going to be giving you rehearsed

4    comments, but I know that one of the things you'll be

5    hearing is that his acceptance of responsibility in this

6    case isn't just because he knows he's violated the law, but

7    because he's violated the law against the very country that

8    he has adopted as his own and who he respects to such a

9    phenomenal extent.

10           He knows that he's privileged to be in this

11   country.  For goodness' sakes, Your Honor, he's privileged

12   to be in this courtroom here today because it sure could

13   have been a heck of a lot worse.

14           But what those letters tell us about him, that

15   Your Honor previously has referred to, in terms of his

16   personal characteristics shows us a life dedicated to the

17   betterment of others, not just himself, but to others.

18           And there's one letter in particular that I wanted

19   to call to your attention.  I'm not going to put it up on

20   the overhead and I'm not going to cite to the name of the

21   letter-writer because I don't have his permission to use his

22   name in this public proceeding here today.

23           But, Judge, it's the same individual who you saw

24   on the video two days ago who talked about having been

25   thrown into prison and having been given a life term because

1    he had 100 T-shirts printed that talked about democracy in

2    his homeland of The Gambia.

3              That letter-writer's attestation of my client's

4    character and what my client did for him and for his family

5    to help with Reverend Jesse Jackson in securing his release

6    goes to the core of what this man's true character really

7    is.

8              And it's a true character surrounded with a

9    constellation of life's experiences: raising money for

10   others, securing health services for others, traveling

11   overseas and transporting people back to this country so

12   they can get medical services that they need, transporting

13   them back across the Atlantic to Gambia so that they can die

14   surrounded by their family members, providing educational

15   tools to students, encouraging students to make of their

16   lives what he has made of his own, an undergraduate degree,

17   a graduate degree, a professional man who now stands before

18   the Court having raised himself up by his own bootstraps out

19   of a mud hut in The Gambia.

20             So if we do take a look at what Section 3553(e)

21   tells us are appropriate considerations, those

22   characteristics of this man strongly support the imposition

23   of a sentence to include a term of probation in this

24   particular case.

25             Your Honor, I wrote to your probation officer,

1    Ms. Andrade-Vera, about this case and in the last paragraph

2    of the letter I wrote to her that it has been my privilege

3    and my honor to have represented this individual in this

4    judicial proceeding, something I never have thought of

5    having written before, and it is because of his character

6    and all that he has taught me about what true character

7    really is and what it really means.

8            Those factors support probation, Judge.  Anything

9    else, I believe, would be greater than necessary to fulfill

10   the statutory elements of sentencing.

11           DEFENDANT MANNEH:  Good afternoon, Your Honor.

12           THE COURT:  Good afternoon.

13           DEFENDANT MANNEH:  I guess first of all I would

14   like to thank the Gambian community.  They have been very

15   supportive throughout this process.  I really appreciate

16   everything that they have done for us and I just wanted to

17   say that before I say anything.

18           And also to thank my attorneys and even the

19   prosecutors and even the FBI agents who were -- everybody

20   treated me the best they could, really.  I mean, this has

21   been a wonderful experience for me as far as getting to see

22   firsthand what this country after all is all about because

23   I've seen with my own eyes how I have been treated with the

24   most -- with dignity and respect, I would say more than I

25   deserved, quite frankly, and to have gone through your court

1    giving all my rights, the rights that have been denied to

2    Gambians back home.  So I really wanted to thank the

3    prosecutors, my lawyers, and the FBI agents and this

4    honorable court for how I have been treated all along.

5                I'm profoundly sorry, Your Honor.  I'm ashamed of

6    what I have done because -- for the simple fact that this

7    country gave me a lot.  I am the only one who went to school

8    in my whole entire family.  My mother -- my brother had to

9    quit school because my mom could not afford 25 cents a month

10   tuition.

11               So coming here was never in my dreams.  I never

12   thought I would come to America.  I never even thought about

13   it.  So I was shocked when I was brought here in 1995 by an

14   American and embraced by his family.

15               I have never looked back.  It's been a wonderful

16   experience.  I went to college here.  I worked three jobs to

17   put myself through college and now I proudly have my

18   master's degree.

19               But more importantly, I think, that I never

20   thought with all the things that I have been endowed with

21   throughout these 20 odd years, I never thought I could get

22   any one of those things, I never had hope.

23               Now, for a country that has given me so much

24   opportunity and given me so much, to have found myself

25   really standing on the other side of the law, accused of

1    having offended the country, that's why from the beginning I

2    never even wanted this thing to go to trial.

3            I decided to plead guilty right away because I

4    realized along the way somehow -- and believe it or not, it

5    came right after the arrest of Papa Faal that I realized,

6    wow, oops, I guess we committed a crime and then from that

7    day on I regret everything I have ever done.

8            Because for me, I never wanted to offend America.

9    I love this country dearly, Your Honor.  I care deeply about

10   this country because I am who I am today because of this

11   country.

12           But it's that same reason also, Your Honor, why I

13   sacrifice for the Gambians on the ground.  I have traveled

14   everywhere in the world, you name it, Europe, Africa,

15   America, everywhere, knocking on every door I could find

16   trying to find answers, trying to get help for those people

17   back home.

18           The video that you saw here is a toned-down

19   version of what was going on in that country because for the

20   most part there are aspects of that country where when you

21   talk to people about it, it is propaganda because those

22   crimes are too grave to bear or the -- I mean, nobody could

23   even imagine in this 21st century that you will have a

24   country in the world -- I'm sorry, my mouth is getting

25   dry -- that you have a country in the world where such

1    crimes are committed.

2            And that's why I've been going all around the

3    place, Your Honor, making sure that the Christian minority

4    in the country are fully protected when it was declared the

5    country is an Islamic state and sharia law is going to be

6    introduced, I've been fighting for that.  When gays have

7    been arrested, I've been all around the place knocking on

8    doors to make sure that we rescue them.  When people get

9    arrested, I'm one of the first people that gets contacted.

10   When somebody gets disappeared, I'm one of the first people

11   who gets contacted.  When somebody is tortured, I am one of

12   the first people that gets contacted.

13           And so on a daily basis I get a dose of the

14   reality of that country.  It is not looking good.  It's

15   really, really bad.  When they're desperate I come to help

16   that situation and I save those lives.

17           I realize now I have committed a crime against a

18   country I love so much and for that and for whatever it's

19   worth, Your Honor, I want to say I am deeply sorry to this

20   country and to anybody who calls this country home.

21           I think for me -- I'm sorry.

22           MR. LARSEN:  Here's some water.

23           DEFENDANT MANNEH:  For me, the gravest lesson I've

24   learned from this is that next time before you do anything

25   just contact a lawyer first and have a word with him

1    because, frankly, breaking the law is not in my DNA.  I have

2    been living in this country for more than 20 years and never

3    been arrested for any crimes.  I've always been a

4    law-abiding citizen and I want to continue being one.

5             I don't intend to ever, ever do anything that

6    would ever again offend this country in any form, shape, or

7    fashion because that's never been my intention.  It never

8    has been and never will be.

9             So I am deeply sorry for what has happened and to

10   have wasted your time on our case during the course of this

11   trial.  I'm sorry.

12             THE COURT:  Thank you.

13             Mr. Mohring.

14             MR. MOHRING:  Thank you, Your Honor.  Judge, the

15   decency and the humanity and the courage of these men have

16   been spoken about actually in some ways on both sides of the

17   prosecution and the defense, but these characteristics are a

18   call to each of us to match that and to show our own.

19             I appreciate the Court's comments about the

20   reference letters.  I put together and gave to the Court

21   just a fraction of the communications that I received.  And

22   as the Court noted, they are powerful, enviable even.

23             Papa Faal has revealed to the Court in the

24   presentence investigation report, himself and in the letters

25   written on his behalf by the people who know him best, as a

1   compelling individual, an educated man.  He has a bachelor's

2   degree.  He has two master's degrees.  He is a doctoral

3   student.  He speaks four languages.

4          He is, as the Court has seen, deeply committed to

5   The Gambia and to the Gambian people, but he is also deeply

6   committed to the United States of America.  He is a

7   decorated combat veteran and he bears the emotional scars

8   and the physical scars from that, from that service.  And I

9   think most important to him and vividly depicted in the

10  letters that people wrote, he is deeply committed to his

11  family, nuclear and extended.

12         It's a wonderful part of this line of work that we

13  get to come into contact with people who have walked under

14  very different circumstances and very different paths than

15  our own.

16         But the question this afternoon is how to judge

17  these men, how to judge these offenses and how to sentence

18  them.  And that challenge, I think, is present to a greater

19  degree in this case than in almost any that I've ever come

20  into contact with.

21         As co-counsel have mentioned, there is no shortage

22  of analogies.  Mr. Birrell brought up Nazi, Germany, and the

23  question of what would we do for someone who committed this

24  offense under those circumstances, but it's an unfortunate

25  part of the human reality of this era that there are no

1       shortage of other examples.

2              My mother was born and raised in Greece.  She

3       survived the Second World War and the Greek civil war that

4       followed it.  She survived the German and Italian occupation

5       of her village and her home.

6              And she came to the United States and she watched

7       in horror in 1967 when her nation, her homeland, the

8       birthplace of democracy, was taken over in a military coup.

9       The military junta ruled Greece from 1967 to 1974 for seven

10      brutal years, conducting the types of tactics and human

11      rights abuses and violent rule that the Court has heard

12      about.

13             And I watched my mother, as a kid growing into an

14      adolescent over those seven years, working with her family

15      members and other members of the Greek diaspora and I

16      watched their confusion and their struggle with how -- what

17      to do and how to respond responsibly under those

18      circumstances and I watched them try to engage the great

19      powers, engage the United States and the United Kingdom and

20      the United Nations, in support of regime change in Greece,

21      but I also watched them struggle with the same confusion

22      that you saw -- you see in these men and that you saw in the

23      video, a concern about what impact their actions might have

24      on their family members in Greece.

25             So I look at these men and I look at my mother and

1    I wonder, but I think it's a question that is one that is

2    placed to all of us in this courtroom and I think most

3    pointedly to you, what would we do under those

4    circumstances, how would we act, how would we want to be

5    judged were we in the footsteps, in the shoes of these men.

6    Sentencing in this case calls on us to answer that question.

7            In the words of one of the people in the video, he

8    said, this is a terrible set of circumstances, one that

9    compels people to act, but if it's your mom, if it's your

10   family being locked up, I guess in terms of the statute that

11   would fall under the nature and circumstances of the

12   offense.

13           In deciding how to respond to that from the

14   standpoint of sentencing, as discussed at length on Tuesday

15   and I won't go into it again, Your Honor, I submit that the

16   guidelines are effectively irrelevant.  The guidelines

17   really do not do any kind of meaningful justice to the human

18   circumstances and the facts -- the uncontested facts of this

19   case.

20           The guidelines provide us no meaningful import or

21   guidance and so we are left with a statute, but we're also

22   left with the fundamental basic three objectives, potential

23   objectives of criminal sentencing: retribution,

24   rehabilitation, and deterrence.

25           Now, the prosecution has talked about how we just

1     can't have this, this is not okay, we cannot have people

2     conducting personal foreign policy.  And they have proven

3     their point.  Each of these men stands convicted of a

4     felony.  They were prosecuted to the full extent of the law.

5     They were convicted of felonies and they will carry that

6     mark for the rest of their days.

7              So this is not a question of guilt or innocence.

8     We don't speak to that.  This is a question of punishment

9     and mitigation of punishment.  The government says it's not

10    okay and they've made that very clear.  That is clear as we

11    stand here this afternoon, regardless of what the Court does

12    in terms of sentencing.

13             In terms of retribution, one thing that became

14    clear on Tuesday in the arguments of counsel is, as the

15    prosecution has acknowledged, they do not -- they don't

16    disagree with these men's objectives.  This is a question of

17    a disagreement with means, but not outcome.  And so

18    retribution for violating American foreign policy is an

19    objective that certainly does not call for or justify a

20    sentence of imprisonment in this case.

21             In terms of rehabilitation, Papa Faal is, like

22    these other men, revealed to the Court to be a decent,

23    honorable, educated man who should be allowed to return to

24    his family and his life.

25             Mr. Richman talked about how the world would be a

1    better place if these men had succeeded and I think the

2    record on that is clear, but I think it's also true that the

3    world would be a better place if we had more people like

4    these men in it.

5           In terms of rehabilitation, the law talks about

6    presentence rehabilitation and allows the Court to consider

7    in mitigation, allows the Court to consider in imposing a

8    sentence below the guidelines circumstances where people are

9    not themselves dangerous.  And these men are not dangerous,

10   not to us.  We do not need to be protected from them.  We do

11   not need a term of imprisonment certainly to protect us from

12   them.

13          And finally, on the question of deterrence, I

14   think the record is equally unambiguous.  These men will not

15   do this again.  Papa Faal spoke eloquently on Tuesday about

16   the anguish that he feels in recognition of what his crime

17   has done to his family members that he will not do this

18   again.

19          But if the Court is concerned about the future

20   possible activity of these men given the depth of their

21   conviction and the depth of their beliefs, those concerns

22   are vindicated much more so by conditions of supervision

23   than they are by sentences of imprisonment.

24          And so that leaves us with what I guess they

25   called in law school general deterrence, and the prosecution

1    in their sentencing position spoke about needing to deter

2    others.  Often they speak about needing to make an example

3    and they use the analogy of ISIS and al-Shabaab and of the

4    allegations against members of this community that they have

5    acted in ways that support those organizations.  That

6    analogy is offensive.  It is inappropriate.  In the words of

7    co-counsel, it's ridiculous.  These are not the people who

8    should be used to deter those others.

9           Papa Faal is a decent man who should be treated

10   and sentenced as such.  I join the prosecution in their

11   request for a departure on his behalf and for a sentence

12   below the guidelines and I urge the Court to impose a

13   sentence of probation.

14           DEFENDANT FAAL:  Good afternoon, Your Honor.

15           THE COURT:  Good afternoon.

16           DEFENDANT FAAL:  I want to first thank the Court

17   for everything that -- the past couple of days we've been

18   here, accommodating all of us here under these

19   circumstances.

20           I also want to thank the Gambian community and my

21   family for their unyielding support in this case.  It's been

22   a rough road since we got back in December.  The community

23   has been unwavering in their support, both financially and

24   emotionally.  So I say thank you to them.

25           Your Honor, in addition to that I want to say that

1    I deeply apologize to the American people and I do apologize

2    to you.

3            I have been in this country for 20 -- probably 25

4    years and since I arrived here all I did was to improve my

5    life and to seek avenues where I can be able to add value to

6    my community.

7            I joined the military in 2002 for the same reason.

8    When watching the World Towers falling and people throwing

9    themselves from the windows of the tower to their demise,

10   the horrible scene, I felt no one should actually sit by and

11   watch.  I joined the military right after that to do my

12   part, no matter how small.

13           Over the years I have gained a lot of friends from

14   both sides.  I've built a community here.  I respect the law

15   deeply.  The reason why we Gambians or Africans, for that

16   matter, leave our country to come to a nation like this, it

17   is not because of the glares and the towers and everything

18   else.  It's because of the value that we admire so much.

19           And when we came -- I came in 1991 when things

20   were stable, we have democratic system, we have rule of law,

21   we have justice.  But I came for education because I wanted

22   to gain what I needed to improve human lives back home.

23           When this coup d'état happened in 1994, I remained

24   here and I continued to do what I needed to do for this

25   community, for this country.  It's a beacon of hope.  And

1    it's true, it's a beacon of hope.

2            That's why the defendants and I are standing right

3    here talking to you, because we achieved the dream that we

4    came for and we achieve so much.  Our neighbors have become

5    our family, our co-workers become our friends.  How

6    wonderful is that.

7            This country, the rule of law here, we always say

8    that this will not happen in the United States.  And we are

9    seeing what's going on back in The Gambia right now with the

10   imprisonment of people who do not -- did not do anything;

11   they are thrown in jail for durations of numbers of years

12   without trial.  We feel that will never happen here.  That

13   will never happen here because of the value that the United

14   States have -- I should say the world has entrusted the

15   United States.  We mean they're entrusted because the whole

16   world assimilates the values that the United States carries.

17   So how awful do I feel right now standing in front of you to

18   say I am sorry for breaking the laws of this great land that

19   I have so much worked to protect and serve.

20           Your Honor, I just wanted to speak briefly about

21   how I feel about the conditions that led to this situation

22   and the aftermath of this whole thing on our families, on

23   me, and our friends.

24           We have been fighting, as I said before, for over

25   two decades and we have seen people in The Gambia go through

1      tremendous, tremendous hardship nobody can ever think of.

2      We have seen our freedom, the very thing that we cherish in

3      the United States here that we go all over the world to

4      defend, that very freedom, the liberties, the right to life,

5      liberty, and pursuit of happiness taken and stripped away

6      from the people of The Gambia.  They go day in and day out

7      sometimes just for existence, they work just for existence,

8      to exist because they're competing with somebody who denied

9      them even the basic means to make a living.  Scores of them

10     are leaving.  They would rather die in the Mediterranean

11     than stay back home under such brutal conditions.

12             We have as human beings, as me as a person and my

13     brothers who are sitting down there, in our conscience

14     sitting down and watching that while we are going all

15     around, as Barrow said, serving in the military for over ten

16     years, defending the liberties of people around the world,

17     in Iraq and we went to Afghanistan.

18             When I went to Afghanistan -- I always tell this

19     story.  When I went to an R&R I went to Germany to my family

20     and we spend about two weeks there before I went back to

21     Afghanistan and there was a guy who came in who was a friend

22     of my brother and he asked this question, Was the war worth

23     it?  And I didn't hesitate to think because I knew why I

24     joined.  I said, Yes, it was.  Yes, it is because for the

25     first time I saw an Afghani carry a table of goods and

1     selling them in the streets so they can be able to feed

2     their families.  That, to me, was something worth dying for

3     because he was able to find means to feed his family; and I

4     meant that.

5          But the people of The Gambia are denied the same.

6     Yahya Jammeh will compete with them directly, even for

7     buying meat.  If you sit down and you're selling meat, he

8     will sit -- you will have a military guy sitting next to you

9     selling meat.  If you are selling oil, you will have a

10    military guy sitting next to you selling oil.  So how can

11    you compete with a state like that where he doesn't pay

12    taxes, he undercuts everything?  So we could not sit down

13    and watch that.

14         So we have tried and tried and tried and tried and

15    the conditions just kept on going.  So as I said the last

16    time, we felt that this was the option, but the outcome was

17    just as difficult and traumatic because our actions directly

18    hurt the very people we were trying to help, that is, our

19    families back home and families here.

20         We lost great brothers.  Njaga Jagne was a great

21    friend of mine.  I look at him -- his memories show every

22    single day in my head, every time I close my eyes.  We had

23    great conversations all the time.  Lamin Sanneh and Alhagie

24    Nyass likewise.  I will never forget the memories of those

25    people.  I will never forget that they left, you know, their

1    families back here.  They were the sole provider for their

2    families and now their children are going to grow up without

3    fathers.  That guilt will stay with me for the rest of my

4    life.

5         And I apologize deeply again for what we did and I

6    apologize deeply for breaking the laws of this great land.

7         And there is a reason why I stayed for 25 years,

8    not because -- I mean, when I came here The Gambia was

9    great.  I stayed because I love this country.  I served -- I

10   joined the military voluntarily because I love this country.

11   I look at the country.  The country needs me.  That's why I

12   joined.

13        And when I got out, I didn't go back to Gambia.  I

14   stayed.  I built a family here.  My daughter is three years

15   old.  I love her to death.  My son, two months old, he is

16   just amazing.  My wife, I just can't say anything about --

17   but I hurt those people at the same time because I put undue

18   burden on them, the uncertainty of everything.  Day in and

19   day out they don't know.  We're struggling.  Like I said

20   before, I drive a taxi for a living.  There are times when

21   our bills are not paid.  I caused that.

22        So how, then, would I see a circumstance like that

23   and throw myself in again?  You throw yourself in the fire

24   just once because when you get out, you want to head to cold

25   water so you can be able to tame your skin.  I will never,

1    ever, as I said before, do anything like this.

2           The Gambian struggle will continue, but because --

3    the Gambian struggle will continue because we have to make

4    sure that people have freedom because everybody deserves so.

5    Everybody deserves the freedom because it's a natural gift

6    for us.

7           So with that, Your Honor, I thank you.

8           THE COURT:  Thank you.

9           Mr. Kovats?

10          MR. KOVATS:  No, Your Honor.  Thank you.

11          THE COURT:  Okay.  Anything else from anybody?

12          Let's take a recess.  Let's come back at 2:30.  We

13   are in recess.

14      (Recess taken at 2:14 p.m.)

15                        *    *    *    *    *

16      (2:39 p.m.)

17                         **IN OPEN COURT**

18          THE COURT:  We are about to turn to sentencing.

19   Before I do, let me just read into the record, for those of

20   you who have not been in on a sentencing before, what the

21   Court is directed by federal law to do.

22          The Court is directed to impose a sentence which

23   is sufficient, but not greater than necessary, to comply

24   with the purposes of sentencing and those purposes include

25   the need for a sentence to reflect the seriousness of the

1     offense, promote respect for the law, and provide just

2     punishment for the offense.  The sentence should afford

3     adequate deterrence to criminal conduct, protect the public

4     from further crimes of the defendant, and it should provide

5     the defendant with needed education and vocational training,

6     medical care, or other correctional treatment in the most

7     effective manner.

8           The Court is to consider the kinds of sentences

9     which are available, which at least in my mind has always

10    been a reference to the advisory guideline range which has

11    been calculated in this case, and the Court is also to avoid

12    what are known as unwarranted sentencing disparities among

13    defendants with similar records who have been found guilty

14    of similar conduct.

15          So those are the factors which the Court has to

16    take into account.  It's not just a matter of I get to look

17    at everybody and decide this would be a good sentence or a

18    bad sentence.  I've got to work those conditions into the

19    sentence, which I will do.

20          So I think what we're going to do, then, is take

21    up the defendants one at a time and it's not going to take

22    very long because the speeches have all been made as far as

23    I know.  So let's start with -- who is the first?

24          THE CLERK:  Cherno Njie.

25          THE COURT:  Mr. Njie, anything you want to say?

1  Anything further from counsel?

2  MR. BIRRELL:  No.  Thank you, Your Honor.

3  THE COURT:  Well, taking all of the factors into

4  account, in my mind a sentence of one year and a day plus

5  three years of supervised release meets all the terms of the

6  statute.

7  I considered basically no time, but I don't think

8  that is appropriate under all the factors here.  I think a

9  year and a day, which you're authorized for a 15 percent

10  reduction in your sentence if you follow all the rules and

11  regulations.

12  And a $10,000 fine.  I don't know if I put that in

13  there.  That's to be paid immediately.

14  I don't know whether there's any recommendation

15  for placement.

16  MR. BIRRELL:  He would request that the Court

17  endorse a placement near his home in Austin, Texas.

18  THE COURT:  And you'll be notified of that.  But

19  obviously you'll have voluntary surrender, so he can leave

20  here.

21  MR. BIRRELL:  Thank you.

22  THE COURT:  You have the right to -- if you are

23  dissatisfied or your lawyer is dissatisfied, you have the

24  right to challenge or appeal the sentence which I have just

25  imposed, not your plea of guilty.  That's in place and you

1    can't do anything about that.  But if you think the sentence

2    is too high or something is wrong with it, you can take an

3    appeal to another federal court which reviews decisions of

4    trial courts such as this.

5          And the way you do that is you file a notice of

6    appeal, which is basically a written document, with the

7    clerk of this court, but it has to be filed within 14 days

8    of the date that the judgment in this case is entered.  The

9    judgment is basically another piece of paper which gets

10   filed with the Clerk's Office.  That piece of paper should

11   be filed, I would guess, tomorrow.  So that 14-day period

12   begins to run at that time.  If you are going to appeal, you

13   must file that notice within that 14-day period.

14         You will be entitled to be represented by counsel

15   in connection with any appeal of the sentence.  If you

16   cannot afford a lawyer, the Court will appoint a lawyer to

17   represent you.  Do you understand that?

18         DEFENDANT NJIE:  I do.

19         THE COURT:  And I want to make sure you understand

20   I'm not talking about your -- you can't change your plea.

21   You can't change that part of it.  That's in place.  It's

22   just the sentence at this stage of the game.

23         Okay.  There's also on your sentence -- I guess I

24   did mention that.  I'm also adding three years of supervised

25   release after the term, so that's in there too.

1    So why don't you go back to your seats --

2    MR. BIRRELL:  Thank you, Your Honor.

3    THE COURT:  -- if you don't have anything else to

4    say.

5    Okay.  Mr. Barrow is next.

6    MR. KOVATS:  Your Honor, if I may --

7    THE COURT:  Let me just add something to the last

8    sentence.  I am required to impose a $200 special assessment

9    for the Crime Victims Fund.

10   MR. BIRRELL:  Yes, Your Honor.  Thank you.

11   MR. KOVATS:  I have a couple of other -- these are

12   bookkeeping things just to make sure that the record is

13   clear.  Defendant Njie had made motions for a downward

14   departure and a variance.  I'm assuming the Court granted

15   those based on the sentence?

16   THE COURT:  Yes.

17   MR. KOVATS:  And then there was some guideline

18   things just to clear up.  And I know that your sentence

19   wasn't necessarily tied to the guidelines, but there was

20   some dispute as to whether or not a leader/organizer

21   adjustment would apply and whether the Court --

22   THE COURT:  I think the leader -- that does apply.

23   MR. KOVATS:  Okay.  And then the Court did not

24   apply the --

25   THE COURT:  Four points?

1          MR. KOVATS:  -- for the firearms?

2          THE COURT:  Yeah, right.

3          MR. KOVATS:  And that was not applied, right?

4          THE COURT:  Right.

5          MR. KOVATS:  Very good.  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          Mr. Friedberg or whoever is going to talk.

8          MR. RICHMAN:  We've said everything we have to

9    say, Your Honor.

10          THE COURT:  Okay.  Mr. Barrow, the Court's view of

11    your sentence is as follows:  You are sentenced to six

12    months in prison and three years of supervised release and

13    there will be no fine.  I think that's about it.  $200

14    special assessment for the Crime Victims Fund.

15          MR. RICHMAN:  Your Honor, given the length of the

16    sentence, would the Court consider making a recommendation

17    to the Bureau of Prisons that his sentence be served in a

18    halfway house rather than in an actual prison facility,

19    which he could do in his community in Nashville?  Just given

20    the way the BOP works, just getting him incorporated into

21    prison life is going to take six months and he'll be done

22    with his sentence, so we would ask for a recommendation that

23    he serve his term in a halfway house with work release

24    privileges.

25          THE COURT:  No, I will not do that.  I think it

1     ought to be a prison term.

2          MR. RICHMAN:  Thank you, Your Honor.

3          THE COURT:  Anything else?  Mr. Friedberg, you're

4     up here quiet.

5          MR. FRIEDBERG:  I don't intend to change that,

6     Your Honor.

7          THE COURT:  It's a good quality.  Thank you.

8          Who is --

9          MR. KOVATS:  Your Honor, I'm going to play the

10    same role of sort of the procedural gadfly and just cover a

11    couple of other things.  I'm just presuming the defense

12    motions for downward departure and variance were granted?

13         THE COURT:  Yes.

14         MR. KOVATS:  And I know that you did notify

15    Defendant Njie of his right to appeal.  Similarly, Defendant

16    Barrow has a right to appeal the sentence within --

17         THE COURT:  I'll say the same thing here.  You

18    have a right to appeal the sentence.  If you want to appeal

19    it, you must file a notice of appeal with the clerk of this

20    court within 14 days of the date that the judgment is

21    entered.  If you let that 14 days go by, you will lose your

22    right to appeal the sentence.  That probably covers it.  And

23    I'm only talking about the sentence.  You can't appeal your

24    plea of guilty.  You can't change your mind about that.

25         MR. KOVATS:  Thank you, Your Honor.

1          THE COURT:  Who is next?  Mr. Larsen, anything you

2    want to say before I pronounce sentence?

3          MR. LARSEN:  No.  Thank you, Your Honor.

4          THE COURT:  Mr. Manneh, you are sentenced as

5    follows:  You are committed to the custody of the Bureau of

6    Prisons for a period of six months with three years of

7    supervised release to follow and I'll recommend -- any

8    placement recommendation?

9          MR. LARSEN:  In the Atlanta, Georgia, area if we

10   may, Your Honor.

11         THE COURT:  I will recommend to the Bureau of

12   Prisons that your place of incarceration be a federal

13   facility within the vicinity of Atlanta, Georgia.

14         I want to make clear, if I didn't to the other

15   two, but certainly to you now, that I don't decide where you

16   will serve your term.  That's not up to me.  All I can do is

17   make a recommendation.  My experience with the Bureau of

18   Prisons is that sometimes they follow it and sometimes they

19   don't.  But you'll be notified probably within six weeks or

20   so where that would be.

21         DEFENDANT MANNEH:  I understand, Your Honor.

22         THE COURT:  And you have a right also to appeal

23   the sentence if you are dissatisfied with it.  If you do

24   that, you must file a notice of appeal within 14 days of the

25   date the judgment is entered.  And you're entitled to be

1    representing by a lawyer in connection with any appeal and

2    the Court will appoint a lawyer to represent you if you

3    decide to appeal.

4              A $200 special assessment for the Crime Victims

5    Fund is also imposed.

6              DEFENDANT MANNEH:  I understand.  Thank you.

7              MR. LARSEN:  Thank you, Your Honor.

8              THE COURT:  Anything else?

9              MR. LARSEN:  Nothing from the defense, Your Honor.

10             THE COURT:  Thank you.

11             MR. KOVATS:  And, Your Honor, if I could just make

12   the record clear as well here that the defendant's motion

13   for a downward departure or variance was granted for

14   Defendant Manneh; is that right, Your Honor?

15             THE COURT:  Yes.

16             MR. KOVATS:  And then there was an issue about

17   whether the leader/organizer adjustment applied and just

18   asking if the Court --

19             THE COURT:  For --

20             MR. KOVATS:  For Mr. Manneh.  I think that was an

21   issue that was -- we discussed it here before you and I

22   think it was an open question.  I know the Court was not

23   inclined to apply the application for a serial number

24   obliteration.

25             THE COURT:  Right.  The serial number is out on

1     all of those.

2              MR. KOVATS:  Okay.  The leader/organizer, I think,

3     is the only matter that I think is still open, Your Honor.

4              THE COURT:  Did I do a leader/organizer on Njie?

5              MR. KOVATS:  You did for Defendant Njie, yes, Your

6     Honor.

7              THE COURT:  That's what I thought.  Okay.  Thank

8     you.

9              MR. KOVATS:  And I think the record was more clear

10    as to that defendant in the government's view.

11             THE COURT:  Okay.

12             MR. KOVATS:  And so I think it remains to be known

13    whether or not we did it for Defendant Manneh, and I know

14    Probation recommended against it if that should help you

15    out.

16             THE COURT:  We'll stick with that recommendation,

17    then.

18             MR. KOVATS:  Thank you, Your Honor.

19             THE COURT:  Thank you.

20             Mr. Mohring.  Okay.  We are with Mr. Papa Faal?

21             MR. MOHRING:  Yes, Your Honor.

22             THE COURT:  Your sentence is as follows:  You are

23    sentenced to time served and three years of supervised

24    release.  So I don't think there's anything else I can cover

25    other than your right to appeal.  I don't think you're going

1    to appeal that sentence, but you do have the right to do so

2    if you wish to do so within 14 days of the date the judgment

3    is entered.

4           I think that is it.  I also want to say for the

5    benefit of the other defendant -- well, the four defendants,

6    the defendants not only have the right to appeal, but the

7    United States also has the right to appeal the sentence if

8    they are dissatisfied with it or if it is dissatisfied.

9           $200 special assessment for the Crime Victims

10   Fund.

11          Okay.  Anything else?  Mr. Mohring, anything

12   further?

13          MR. MOHRING:  (Shaking head.)

14          THE COURT:  I think I am getting a note here.

15      (The Court and probation officer confer)

16          THE COURT:  You can sit down if you want.  I've

17   just got to read the terms of the supervised release.  The

18   terms of supervised release have the following mandatory

19   conditions and they include the following:

20          First, the defendant must report to the

21   U.S. Probation Office in the district to which you are

22   released within 72 hours of your release from the custody of

23   the Bureau.

24          The defendant cannot commit any crimes, federal,

25   state, or local, during the period of supervised release.

1          I'm suspending mandatory drug testing based upon

2     my determination that the defendant posed a low risk of

3     future substance abuse.

4          No defendant may possess a firearm, ammunition,

5     destructive device, or any other dangerous weapon during the

6     period of supervised release.

7          And the defendant shall cooperate in the

8     collection of DNA as directed by the probation officer.

9          The defendant shall also submit his person,

10    residence, office, vehicle, and area under his control to a

11    search conducted by the U.S. Probation Office in a

12    reasonable time and in a reasonable manner based upon

13    reasonable suspicion of contraband or evidence of a

14    supervision violation.  The defendant shall warn any other

15    residents or third parties that the premises and areas under

16    his control may be subject to searches pursuant to this

17    condition.

18         The defendant shall not possess or use a computer

19    or have access to any online service without the prior

20    approval of the Probation Office.  The defendant's

21    cooperation shall include, but not be limited to, allowing

22    installation of a computer and Internet monitoring program

23    and/or identifying computer systems, Internet-capable

24    devices, and similar memory and electronic devices to which

25    the defendant has access.  The monitoring may include random

1   examinations of the computer system, along with Internet,

2   electronic, and media storage devices under the defendant's

3   control.  The computer system or devices may be removed for

4   a more thorough examination if necessary.

5        If not employed at a regular lawful occupation as

6   deemed appropriate by the probation officer, the defendant

7   may be required to perform up to 20 hours of community

8   service per week until he or she is employed.  The defendant

9   may also participate in training, counseling, daily job

10  search, or other employment-related activities as directed

11  by the probation officer.

12       The defendant shall provide the probation officer

13  with access to any requested financial information,

14  including credit reports, credit card bills, bank

15  statements, and telephone bills.

16       The defendant shall not possess, view, access, or

17  otherwise use material that reflects extremist or

18  terroristic views or is deemed to be inappropriate by the

19  U.S. Probation Office.

20       The defendant shall participate in a mental health

21  counseling program as approved by the probation officer.

22       The defendant must submit to periodic polygraph

23  testing at the direction of the probation officer as a means

24  to ensure that you are in compliance with the requirements

25  of your supervision.

1          Although I have already done this, I will do it

2    again.  The Court imposes a $200 special assessment for the

3    Crime Victims Fund, which amount is required by statute to

4    be paid immediately.

5          I think that's it.  Anything else we need to

6    cover?

7          PROBATION OFFICER:  (Shaking head.)

8          THE COURT:  I want to say to counsel and to the

9    defendants, I appreciate the manner in which this was

10   handled here today at sentencing.  I think it was very

11   professional and I appreciate the attitude of the

12   defendants.  I don't know whether they are pleased or

13   displeased with the sentence which I have imposed, but I

14   guess I can't control that.  I did what I thought was the

15   best I could do.

16         If I take your views here as expressed before

17   sentencing at face value, I don't think -- no one is going

18   to have to worry about you coming back into federal court.

19   And I hope you mean it.  I think you made a big mistake in

20   the conduct which got you here today.

21         Even though it was well-intentioned, you just

22   cannot take basically the law into your own hands and decide

23   how to reform another government or do anything like that.

24   So think a long time before you try anything like that again

25   or do anything.  I'm not -- by saying this I'm not thinking

1    you are going to do anything like that.  I think you've

2    learned your lesson.  Hopefully you will be back in

3    responsible positions in your communities and give faith to

4    those letters which all came in on our behalf.

5         And those letters -- as I said earlier, they were

6    great letters.  I found them very informative.  For those of

7    you that are out there and wrote them, I thank you again.

8    And keep in mind these defendants may need some support when

9    they get back in your own community, so don't let them down.

10         On that note -- voluntary surrender, yes.

11         MR. RICHMAN:  Your Honor, I ask for a

12    recommendation on behalf of Mr. Barrow that he be designated

13    to a facility near his home in Nashville, Tennessee.

14         THE COURT:  That will be granted.

15         MR. RICHMAN:  Thank you, Your Honor.

16         THE COURT:  Anything else from any of the other

17    defendants, then?

18         MR. MOHRING:  Your Honor, from the sublime to the

19    mundane, I would just like to clarify the computer condition

20    that was among the list of supervised release conditions.

21    The Court ordered that all of the defendants not be allowed

22    access to a computer without prior approval of Probation.

23         I would just ask that the Court allow Mr. Faal to

24    have a computer with all the monitoring, bells and whistles

25    attached so that he can use it for his school.  He's

1      studying for a Ph.D. and he needs a computer and Internet

2      access to be able to do that.

3              THE COURT:  How do we handle that?

4              PROBATION OFFICER:  That's up to you.  Your Honor,

5      we're not restricting the defendant from a computer.  We're

6      just going to approve the use of the computer, if he needs a

7      computer, to make sure that it's compliant with our ability

8      to monitor --

9              THE COURT:  If it's not compliant, you know where

10     to go.

11             MR. MOHRING:  Fair enough.  Thank you, Judge.

12             THE COURT:  Anything else?

13             Okay.  Thank you all for coming in and good luck.

14             THE CLERK:  The voluntary surrender date?

15             THE COURT:  Oh, voluntary surrender date.  How

16     long do you want?  A month?

17             MR. BIRRELL:  A month sounds good, Your Honor.

18             MR. RICHMAN:  I think typically it's -- well, I'm

19     not sure that typically there is a date set.  I think that

20     once -- I think working through Pretrial Services, once the

21     Bureau of Prisons sets a designation, they're given a

22     surrender date to that facility.

23             THE COURT:  Does the Bureau send that out, you

24     mean?

25             MR. RICHMAN:  The Bureau notifies Pretrial

 1    Services.  Pretrial Services notifies the defendant.  But we

 2    don't control, nobody can control what and when the Bureau

 3    of Prisons does and it's often not done within a month.

 4          MR. KOVATS:  I would defer to Pretrial Services,

 5    but my understanding is the same as Mr. Richman's.

 6          THE COURT:  Let's do that, then.

 7          MR. KOVATS:  That voluntary surrender will happen

 8    when they're told to surrender?

 9          THE COURT:  Right.

10          PROBATION OFFICER:  Your Honor, you can set that

11    date for voluntary surrender.  If there is no date set, then

12    the Bureau will designate that date for the defendants to

13    report to the facility.  So you still can set a voluntary

14    surrender date and designation will happen quite often --

15    they could be designated within a week, two weeks.

16    Designations happen very quickly.

17          THE COURT:  What's a date that would fit

18    everybody's schedules?  30 days from now?

19          MR. RICHMAN:  I think 30 days is appropriate.

20          THE COURT:  If anybody needs more time, they can

21    come back.  Voluntary surrender will be 30 days.

22          Anything else?

23          PROBATION OFFICER:  No.

24          THE COURT:  Anything else from anybody?

25          MR. KOVATS:  No, Your Honor.  Thank you.

1          THE COURT:  We are in recess, then.

2      (Court adjourned at 2:58 p.m.)

3                          *      *      *

4

5

6

7          I, Lori A. Simpson, certify that the foregoing is a

8      correct transcript from the record of proceedings in the

9      above-entitled matter.

10

11                  Certified by:  *s/ Lori A. Simpson*

12                             Lori A. Simpson, RMR-CRR

13

14

15

16

17

18

19

20

21

22

23

24

25